284 N.J. Super. 67 (1995)
663 A.2d 643
JANET MILLER, TAMI ABELL, CARY REED, AND MIRIAM KOTEEN, PLAINTIFFS,
v.
AMERICAN FAMILY PUBLISHERS, DEFENDANT.
Superior Court of New Jersey, Chancery Division Bergen County.
Decided March 1, 1995.
*71 Jeffrey W. Herrmann, William J. Pinilis, for plaintiffs (Cohn, Lifland, Pearlman, Herrmann and Knopf).
Michael P. Zweig of the New York Bar and Robert E. Bartkus, for defendants (Pinto, Rodgers and Kopf).
LESEMANN, J.S.C.
This suit raises novel questions as to the application and interpretation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to 48 (the Act). It comes before the court on defendant's motion for summary judgment dismissing the complaint of four individual plaintiffs, not only as to the alleged violations of the Act, but also as to additional charges that the actions complained of constitute common law fraud.
*72 Plaintiffs have cross-moved for summary judgment. That motion, together with the common law fraud issues, will be discussed later in this opinion. The major issues, however, arise from defendant's motion to dismiss the charge of violations of the Act, and they will be discussed first.

A. INTRODUCTION AND GENERAL DESCRIPTION OF THE PARTIES
Defendant American Family Publishers is in the business of selling magazine subscriptions. Its major sales campaign consists of a highly publicized "sweepstakes" offering million dollar prizes, conducted by a mass mailing to homes throughout the country. Since the parties have agreed that information as to the volume of mailings, number of responses, and dollar amounts of sales should be treated as confidential, those numbers will not be set out here. Suffice it to say that the number of responses received by defendant to its sweepstakes mailing is great, and while less than half of those responses contain orders for magazines, that number alone is more than substantial.
Plaintiffs are four persons who entered defendant's sweepstakes. Two of them  Cary Reed and Miriam Koteen  ordered magazines from defendant. The two others  Janet Miller and Tami Abell  did not. All claim that defendant's campaign violates the Act and also constitutes common law fraud. They seek injunctive relief, damages, and counsel fees. The damages involved seem insubstantial. The issue of injunctive relief, however, is substantial indeed.
Defendant is neither the oldest nor the largest sweepstakes operator in the magazine subscription business. However, it is a major operator in that field. It enhances its program by use of celebrities such as television personalities Ed McMahon and Dick Clark, and announces its winners on the nationally televised "Today Show."
Defendant's campaign is not a "soft sell" effort. Its mailings are designed to be eye-catching and dramatic. They are multicolored; *73 employ large, block letters; pictures of their featured celebrities; and direct appeals to individually named addressees. Each addressee is assigned seven designated numbers and is urged to return enclosed stamps bearing those numbers because one of them might be a winner in the sweepstakes. Prizes are said to include four awards of ten million dollars each and three of two million dollars each.
Defendant asserts that one need not buy a magazine subscription in order to participate in, or win, its sweepstakes. Its mailings so state, and plaintiffs do not deny that proposition.
However, plaintiffs do contend that defendant's mailings fraudulently suggest that one has a better chance to win if one buys a magazine subscription than if one does not. In that way, plaintiffs claim, defendant misleads the public and violates the Consumer Fraud Act.[1]
Before analyzing those charges, a discussion of the Consumer Fraud Act will be helpful in order to view defendant's actions in the context of the Act they are said to violate.

B. THE CONSUMER FRAUD ACT

1. General Purpose and Application of the Act.

The key substantive provisions of the Consumer Fraud Act are set out in Section 2, N.J.S.A. 56:8-2:
The act, use, or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ..., whether or not any person has *74 in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice....
In Cox v. Sears Roebuck & Co., 138 N.J. 2, 647 A.2d 454 (1994), our Supreme Court reviewed the Act, analyzed many of its key provisions, and set out a number of principles applicable to this case.
The Act, noted the Court, was adopted in 1960 "to permit the Attorney General to combat the increasingly wide-spread practice of defrauding the consumer." Id. at 14, 647 A.2d 454. It was amended in 1971 with the intent of giving "New Jersey one of the strongest consumer protection laws in the nation." Id. at 15, 647 A.2d 454. That amendment expanded the critical definition of an "unlawful practice" to include "unconscionable commercial practices." Of particular importance to us, it also provided for "private causes of action," with provisions for treble damages and awards of counsel fees. The statement of then Governor Cahill  quoted in Cox  was that
those provisions would provide `easier access to the courts for the consumer, [would] increase the attractiveness of consumer actions to attorneys and [would] also help reduce the burdens on the Division of Consumer Affairs.'
[Cox, supra, 138 N.J. at 15, 647 A.2d 454.]
In Cox, the Court also repeated its earlier statement in Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69, 494 A.2d 804 (1985), that "the Act should be construed liberally in favor of consumers." Cox, supra, 138 N.J. at 15, 647 A.2d 454. And it also noted that it is the "capacity to mislead" which is at the heart of the definition of an "unlawful practice." Id. at 17, 647 A.2d 454. A practice can be unlawful "even if no person was in fact misled or deceived thereby." Ibid. See also the statement in Barry that the test of whether sales material violates the Act is whether it is "misleading to the average consumer." Barry, supra, 100 N.J. at 69, 494 A.2d 804.

2. "Affirmative Acts" and "Knowing Omissions"

The Cox opinion also points out that there are two kinds of violations defined in Section 2 of the Act: affirmative acts and *75 knowing omissions.[2]
The "affirmative acts" defined in Section 2 as unlawful acts are set out in the disjunctive. They include:
i) unconscionable commercial practices;
ii) deception;
iii) fraud;
iv) false pretense;
v) false promise;
vi) misrepresentation.
Proof that a defendant's action contravenes any one of those standards will establish a violation of the Act  regardless of any proof of intent. With respect to "affirmative acts,"
intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act.
[Cox, supra, 138 N.J. at 17-18, 647 A.2d 454.]
The second type of statutory violation  "knowing omissions"  can consist of:
i) concealment;
ii) suppression; or
iii) omission.
With respect to those violations, however, intent is an essential element. There must be proof that the defendant acted knowingly, with intent that another rely on such concealment, suppression, or omission. Id. at 18, 647 A.2d 454.

*76 3. The Need for a Private Plaintiff to Show an "Ascertainable Loss"

As noted, it was a 1971 amendment which authorized private parties to sue for violation of the Consumer Fraud Act, a power previously vested only in the Attorney General. The amendment did not, however, give private litigants the same broad authority as the Attorney General.
The Attorney General may sue to halt any unlawful practice, to recover penalties, or to recover losses sustained by any victim. A private plaintiff, however, must not only show a violation of the Act, but must also demonstrate that he or she "suffered an `ascertainable loss ... as a result of' the unlawful conduct." Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 473, 541 A.2d 1063 (1988). And there must be a "causal relationship" between the unlawful practice and the "ascertainable loss" sustained by the plaintiff. Ramanadham v. New Jersey Mfrs. Ins. Co., 188 N.J. Super. 30, 33, 455 A.2d 1134 (App.Div. 1982). See also Cox, supra, 138 N.J. at 21-23, 647 A.2d 454.

C. PLAINTIFFS' CLAIMS OF VIOLATIONS OF THE ACT
Plaintiffs contend that defendant's advertising materials are deceptive and violate the Act in three respects:
First, plaintiffs say defendant deliberately plants the impression that chances of winning its sweepstakes are enhanced by ordering a magazine subscription.
Second, plaintiffs claim that those who respond to defendant's earlier mailings are thereafter urged to submit further responses through misrepresentations that they have survived a "winnowing down" process which has placed them in a select group of "finalists" and has increased their chances of winning.
Third, plaintiffs point to defendant's "alert" to sweepstakes participants who have not previously ordered magazines, implying that a continued failure to subscribe will lead to their being dropped from the contest.
*77 Plaintiffs say that a central feature of all these misrepresentations is a deliberate merging and confusing of the two "offers" presented in defendant's material: the offer of a magazine subscription and the offer of a chance to win a great deal of money. This technique enables defendant to use language which, if read literally and carefully, is seen to relate only to the purchase of a magazine, but which in fact will likely be understood by most readers as applying to the sweepstakes. In that way, plaintiffs claim, defendant places itself in a position to claim that all its statements are literally true, while at the same time creating the misleading impression it wants to give to potential customers. Plaintiffs contend that
these mistaken impressions, deliberately created by defendant, are exactly the type of `unconscionable, commercial practices' and/or misleading statements the Act seeks to prohibit and punish.
Examination of the sample materials submitted and analysis of those materials in the context of the Consumer Fraud Act, makes clear that (at least for purposes of meeting a motion for summary judgment to dismiss their complaint) plaintiffs have shown sufficient facts to demonstrate, prima facie, that their quoted statement is correct and defendant's motion must be denied.

1. The Indication that Chances of Winning the Sweepstakes are Enhanced by Ordering a Magazine Subscription

Throughout defendant's soliciting literature is a constant plea and demand for an immediate response. That pattern is characterized by such statements as "URGENT: ... MAIL AT ONCE"; "RETURN YOUR ADDRESS LABEL RIGHT NOW"; "TIME IS RUNNING OUT...." And those phrases, with almost infinite variations, are repeated in virtually every piece of solicitation material.
That emphasis on the need for speed is combined with an emphatic, albeit implied, indication that one's chances of winning the sweepstakes are enhanced if one also buys a subscription. To convey and give weight to that impression, the "time/speed" theme is repeated.
*78 Thus, one solicitation says that although the customer has said "No" to previous subscription offers, American Family is providing "one more chance" to get in on free gifts, savings, and offers. One of the key sentences then says:
Order at this time and to show you how much your business is appreciated when you become a customer, American Family will give your reply top priority. That's just one of the benefits you'll enjoy as a valued customer: being first in everything, including big news and opportunities like this!
On that same mailing piece, there is a "p.s." at the bottom with these statements:
Remember, `time is money,' so don't delay. For the FASTEST ENTRY in this fabulous sweepstakes, why not use the special stamp at the right and `take the YES EXPRESS'? Here's how it works.
There then follows a description of how one places the "YES" stamp on the envelope (thus ordering a magazine subscription), followed by this sentence: "That way you're sure of getting the FASTEST ENTRY AND PROCESSING."
This presentation is a clear example of the technique referred to above, and discussed at some length in the report of plaintiffs' expert.
Defendant is correct that a careful, literal reading of the quoted language reveals that the words do not actually say what plaintiffs claim they are intended to convey: that the language refers only to magazine subscriptions and not to winning defendant's sweepstakes.
But that response is disingenuous. The references to "speed" and "fast ordering" have no meaning as applied to ordering a magazine subscription. And certainly, with the bulk of the mailing trumpeting the chance to win ten million dollars and the need to act quickly in order to do so, it is likely that a substantial number of readers will understand the references to "top priority" and "fast entry and processing" as relating to the sweepstakes and not just to the ordering of a magazine. Absent some other rational reason for the inclusion of that language in defendant's solicitation (and defendant submits none), plaintiffs' explanation is compelling: the words are intentionally used to create the misleading *79 impression that a magazine subscription will help one's chances of winning the sweepstakes.[3]

2. The "Finalist" Claim

Plaintiffs' second claim of misrepresentation is based on defendant's advising many sweepstakes participants that they are "FINALIST(S)!" in defendant's multimillion dollar contest.
On the sample submitted, that "finalist" notice is in block letters, one-half inch high. On the reverse side of the announcement is a further statement, in the form of a letter reading as follows:
Dear Keena Reed:
Entries you returned earlier have just been processed, and ...
... it gives me great pleasure to officially welcome you to the only group from which the new TEN MILLION DOLLAR WINNER will emerge. Yes, you are a finalist, Keena Reed!
Now, you are in the home stretch to the TEN MILLION DOLLAR GRAND FINALS that began with Phase One when our computers produced Keena Reed as ... eligible as a contestant in this sweepstakes. Then came Phase Two and the registration of contestants.... Next, in Phase Three, official documents were printed, inscribed, and sent all across America until only today the REED FINALIST DOCUMENTS made their way to [you]....
Plaintiffs argue that the "finalist" notice clearly implies that the person addressed[4] is one of a much smaller number of contestants than the total that began the sweepstakes. They claim that a normal reading of that literature describes a "winnowing down" process from a large group in Phase One, to a somewhat smaller group in Phase Two, and then, finally, to a still further reduced group of "finalists." The natural meaning of that description, they say, is that the party addressed in this "finalist" solicitation has a *80 much greater chance of winning than the larger group who never made the "finalist" category.[5]
In her deposition, plaintiff Reed said that was, indeed, her understanding of the "finalist" message. She thought it meant
we're weeded out, and I am one of the finalists, among a small group of people
qualifying for that finalist category. She "figured it was in the thousands, a few thousand."
Ms. Reed's claimed understanding is certainly not unreasonable or irrational. Indeed, on what has been submitted at this stage of the proceedings, it seems clear that such an impression was precisely what defendant intended to convey. If that were not the case, it is difficult to understand what defendant had in mind and what message it did intend to convey.
As acknowledged by defendant's vice-president, Stephen F. McCarthy, there is no "winnowing process." In fact the term "finalist" has no meaning at all. Mr. McCarthy acknowledged that every person who responded in Phase One automatically made it through Phase Two and then Phase Three. When asked if he knew
any reason why the language Phase One, Phase Two, and Phase Three is used on the solicitations?
he answered,
"No."
Plaintiffs' expert, Robert Borders, concluded that the "finalist" message is "both disingenuous and deceptive." But expert opinion is not necessary to reach that obvious conclusion. The statement made, the fictional categories described, and the claimed effect of being a "finalist" are all representations made with the clear intent, and likely effect, of conveying a misimpression of fact. And contrary to defendant's argument in its brief and at oral argument, the "finalist" claim is not mere "puffing." That term *81 implies simply an exaggerated claim of quality rather than a statement of fact. See, e.g. Black's Law Dictionary 1233 (6th ed. 1990); Gulf Oil Corp. v. FTC, 150 F.2d 106, 109 (5th Cir.1945).
That is not what we have here. The "finalist" description is not simply an exaggeration. It is a statement of fact  and it is a statement which is simply not true.[6]

3. The Threat of Being Dropped

The third alleged misrepresentation cited by plaintiffs refers to solicitation material which threatens to "drop" a participant from the sweepstakes if he or she does not subscribe to one of defendant's magazine. The message is obviously designed to alarm and induce action. It is not subtle!
Thus, one typical mailer is set out in thick, red, block lettering seven-eighths of an inch high saying

CODE 1

DROP ALERT
On the second page, in more red, block letters (although somewhat smaller) it says
YOU'RE IN DANGER OF BEING DROPPED!
Please be advised: ever-increasing postal costs will force us to make serious cutbacks. And that puts you in danger of being dropped from our regular mailing list.

*82 We're sorry that this is an issue, but the people who buy from us are the ones who keep our business going.
* * * * * * * *
For those who do not order or write to stay on our list, this could be the end of the line. Time is running out, and we'd really hate to lose you. Please... DON'T BE DROPPED  ORDER NOW.
Under that are two stamps available for selection by the recipient. One says: "Yes. My order is enclosed. Keep me on your list!" The other says: "No. I'm not ordering. I know I may be dropped."
Defendant says these "threats" refer only to removal of a name from future mailing lists  not to being dropped from the sweepstakes. And it points out that the recipient can stay on the list either by ordering a magazine or simply by returning a card requesting that he or she be retained on the list.
Once again, defendant's literal reading of the language is not inaccurate. But also, once again, that reading has little relation to reality.
Just as in the instances noted above, defendant's presentation blurs any distinction between the two purposes of the solicitation: to invite participation in the sweepstakes and to sell magazine subscriptions. And while a careful, literal reading may reveal that the threatened "drop" refers only to magazine solicitation and not to the sweepstakes, that reading is certainly not made apparent to an average reader.
In none of the language quoted is there a clear, unequivocal, and conspicuous statement to negate the hypothesis just suggested. Nothing says that a failure to order a magazine will not prevent one from winning the sweepstakes. Rather, the entire tenor of the presentation seems likely to convey a contrary impression to any reasonable, average reader: that one who does not buy a magazine subscription is likely to be "dropped" from participation in the sweepstakes.
Finally, it is difficult to conceive of any reason for the dramatic presentation  the large, bright red block letters and the words of *83 alarm  unless it is defendant's intention to create just the misleading impression cited by plaintiffs: that a failure to subscribe will keep one out of the sweepstakes.[7]

D. PLAINTIFFS HAVE SHOWN A PRIMA FACIE VIOLATION OF THE ACT
In the three areas discussed above, plaintiffs have demonstrated (at least for purposes of meeting a motion for summary judgment) that defendant's activities are likely to mislead an average, reasonable consumer. Thus, plaintiffs' have shown a prima facie violation of the Act.
First, the conduct constitutes an "unconscionable commercial practice." As noted in Cox, that term is designed "to establish a broad business ethic." It implies a lack of good faith, honesty in fact and observance of fair dealing. [Cox, supra, 138 N.J. at 18, 647 A.2d 454.]
Here, the entire tenor of defendant's promotional literature has the "capacity to mislead." It misleads by strongly implying that purchase of a magazine subscription will enhance one's chances to win the sweepstakes. It misleads by saying (not just implying) that the contestant to whom the mailer is addressed has survived some earlier thinning out process and now has an enhanced likelihood of success in the sweepstakes. And it misleads by indicating that if the reader does not buy a subscription, he or she will be dropped from any opportunity to win the sweepstakes.
All of those implications and suggestions are false. Clearly, under a standard of "good faith, honesty in fact, and observation of fair dealing," such false implications and suggestions cannot pass muster. They represent a patent example of an "unconscionable commercial practice."
*84 Note too that since the acts complained of constitute "affirmative act" violations, plaintiffs need not show an "intent" to mislead. See Cox, supra, 138 N.J. at 17, 647 A.2d 454, and discussion above. Nevertheless, it seems likely  indeed almost self-evident  that defendant intended the misleading impression it created. That being so, the "unconscionability" seems even more clear and stark.[8]

E. NEITHER DEFENDANT'S DISCLAIMERS NOR THE LITERAL TRUTH OF THEIR SOLICITATIONS CONSTITUTE DEFENSES TO PLAINTIFFS' CLAIMS
Defendant's primary defense is a reference to what it claims is the literal accuracy of its materials. It notes, correctly, that all its solicitations contain a statement that "no purchase [is] necessary to enter or win." And it contends that much of what seems to refer to its sweepstakes actually refers to the purchase of magazine subscriptions and, if read carefully, is technically accurate.
It is true that in each of defendant's mailings there is at least one piece of literature containing the quoted disclaimer or a similar statement. But it is also true that such language is overwhelmed, and virtually lost, amid the other statements  larger, more colorful, and more dramatic  than the formal disclaimer.
In most cases, the disclaimer is approximately one-quarter inch high. It is often in blue, near other letters also in blue. And in *85 almost every case, it is at or near the bottom of the page. If it is not designed expressly for the purpose of minimizing its visibility, the overall layout of the literature certainly enhances that likelihood.
That placement seems consistent with the overall tenor of defendant's presentation as described above: a carefully constructed message which avoids literal misrepresentation while doing everything possible to create an inaccurate and misleading impression.
If that contention is sustained at trial  if defendant's materials are found to be misleading and deceptive  then a finding of literal accuracy will not bar a conclusion that the materials violate the Consumer Fraud Act. As noted above, the test is the "capacity to mislead" an average consumer. Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69, 494 A.2d 804 (1985). And in this and other contexts dealing with fraud, deception, or other misleading representations, courts have consistently rejected literal truth as a defense to what is actually an untrue and misleading presentation.
One of the clearest statements of the principle is that of Justice Black in Donaldson v. Read Magazine, Inc., 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628 (1948).
Donaldson was a mail fraud case involving, coincidentally, advertisements designed to promote magazine and book sales. The advertisements invited participation in what was termed a puzzle contest, with a $3.00 admission fee. In fact, the "puzzle" was something that most entrants could easily solve, and the winners would actually be determined by an essay-writing competition designed to break the "tie" among the approximately 35,000 entrants who "solved" the puzzle. In addition, in order to win, a fee of $9.00 and sometimes more, rather than the initial $3.00, was required.
The Court acknowledged that
There were sentences in the respondents' advertisements and communications which, standing alone, would have conveyed to a careful reader information as to the nine-dollar fees and the letter essay feature of the contest.... But they did *86 not stand alone. They were but small and inconspicuous portions of lengthy descriptions....
[333 U.S. at 185-86, 68 S.Ct. at 595-96, 92 L.Ed. at 639.]
The advertisements were "models of clarity," said the Court, in presenting those aspects of the promotion which were designed to attract and stimulate consumer involvement. However, when they presented the disclaimers and the other less attractive parts of the promotion, the advertisements became "models of obscurity," with the unpleasant details written "in small type" and buried where none but the most meticulous reader would read and understand them.
The Court's conclusion was that the writings
had been artfully contrived and composed in such manner that they would confuse readers [and] distract their attention from the [real nature of the promotion] and mislead them into thinking they were actually entering [a bona fide puzzle contest].
[333 U.S. at 188, 68 S.Ct. at 597, 92 L.Ed. at 640.]
That, said the Court, was sufficient to constitute fraud:
That exceptionally acute and sophisticated readers might have been able by penetrating analysis to have deciphered the true nature of the contest's terms is not sufficient to bar findings of fraud by a fact-finding tribunal. Questions of fraud may be determined in the light of the effect advertisements would most probably produce on ordinary minds.
[333 U.S. at 189, 68 S.Ct. at 597, 92 L.Ed. at 640.]
To the same effect, also in a mail fraud case (and citing Donaldson v. Read Magazine, Inc.), see, e.g. United States Postal Serv. v. Allied Treatment, Inc., 730 F. Supp. 738, 739 (N.D.Tex. 1990):
To determine whether an advertisement or solicitation makes a false or misleading representation, the court must consider the effect that the advertisement, taken as a whole, would produce on one with an ordinary and unsuspecting mind. A court must consider the implications of an advertisement because, if it is designed to deceive the reader, an advertisement `may be completely misleading' even if `every sentence separately considered is literally true.' Donaldson v. Read Magazine. ... Taking an advertisement or solicitation as a whole means considering not only what it states literally, but also what it reasonably implies.
While no New Jersey case has dealt with this question in applying the Consumer Fraud Act, the issue has arisen in other contexts, and on each occasion its resolution has been the same as that in Donaldson.
*87 Thus in Gladden v. Cadillac Motor Car Div., 83 N.J. 320, 336, 416 A.2d 394 (1980), the Supreme Court declined to give effect to a warranty disclaimer concerning an automobile tire because the disclaimer "was not prominently, conspicuously, and clearly set forth." In so doing, it quoted approvingly from Donaldson:
Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such a way as to mislead.
Similarly, in State v. Rodgers, 230 N.J. Super. 593, 601, 554 A.2d 866 (App.Div.) certif. denied, 117 N.J. 54, 563 A.2d 821 (1989), the Appellate Division, while dealing with the crime of theft by deception, quoted a similar statement from the commentary which accompanied promulgation of the New Jersey Criminal Code:
[T]heft by deception `occurs where one obtains the property of another by purposely creating a false impression.'.... It is the falsity of the impression purposely created or reinforced, rather than of any particular representation made by the actor, which is determinative. Thus, it is possible to deceive by statements which are literally true.
There is no reason to believe that the rule in this State is or should be any different from that set out by the United States Supreme Court in Donaldson, and adopted by virtually every court that has considered the matter: a claim of literal truth will not constitute a defense to a charge that the overall impression created by an advertisement is misleading and deceptive to an ordinary reader. That being so, defendant's references to its claimed disclaimer and the literal truth of its presentations do not constitute defenses to plaintiffs' prima facie showing that defendant has violated the Consumer Protection Act.

F. PLAINTIFFS HAVE SHOWN AN ASCERTAINABLE LOSS
As noted above, in a suit alleging violation of the Consumer Fraud Act, a private plaintiff must show not only a violation of the Act, but also that he or she suffered an "ascertainable loss" as a result of that violation.[9] Plaintiffs here claim that Ms. Reed and *88 Ms. Koteen suffered "ascertainable loss" because they relied on defendant's misleading sales material when they purchased magazine subscriptions. They say they paid money because they were told, and believed, that for their money they would receive two things: first, a magazine subscription; and second, the ability to remain a part of defendant's sweepstakes (they would not be "dropped") and an enhanced likelihood of winning that sweepstakes. They acknowledge that they received the first. They say they did not receive the second.
That hypothesis seems to be a clear example of what one would normally believe the term "ascertainable loss" should encompass. If one sets out to purchase two things, and for the price paid receives only one, the conclusion seems inescapable that there has been an "ascertainable loss." Indeed, defendants submit no argument as to why that seemingly obvious conclusion should be rejected.
Although no New Jersey case has squarely addressed the issue, several courts outside this State which have dealt with the question  most notably the Supreme Court of Connecticut  have reached conclusions consistent with this reading of the term "ascertainable loss."
In Hinchliffe v. American Motors Corp., 184 Conn. 607, 440 A.2d 810 (1981), plaintiff bought an automobile which had been advertised as having "full-time four-wheel drive." In fact, it had only a system for transmitting power to different wheels by what was described as a "limited slip differential mechanism." The two *89 were significantly different and, as a result, the vehicle suffered a considerable loss of traction under certain conditions. Plaintiff sued under the Connecticut Unfair Trade Practices Act, which contains many provisions similar to the New Jersey Act, including a requirement that an individual plaintiff show "ascertainable loss."
The trial court dismissed the complaint on the grounds that plaintiff had not proved "actual damages in a particular amount." The Supreme Court reversed, holding that the term "ascertainable loss" did not require a plaintiff to prove a "specific amount of actual damages." In doing so, it discussed at some length the meaning of the term "ascertainable loss" setting out a rule which would clearly qualify plaintiffs' claims here as involving "ascertainable loss":
Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known.... When the product fails to measure up [to reasonable expectations based on the representations made], the consumer has been injured; he has suffered a loss. [H]e has lost the benefits of the product which he was led to believe he had purchased.
[184 Conn. at 614, 440 A.2d at 814.]
In short,
[t]o satisfy the `ascertainable loss' requirement, a plaintiff need prove only that he has purchased an item partially as a result of an unfair or deceptive practice or act and that the item is different from that for which he bargained.
[440 A.2d at 814.]
A similar view was expressed by the Michigan Court of Appeals in Mayhall v. A.H. Pond Co., Inc., 129 Mich. App. 178, 341 N.W.2d 268 (1983), where defendant misstated the quality of a diamond ring sold to plaintiff. There, in dealing with the statutory requirement that plaintiff show "loss,"[10] the court found such a "loss" in the plaintiff's "unfulfilled expectations." A "loss" exists, said the court, when a "victim does not receive what he expected to *90 receive." 129 Mich. App. at 185, 341 N.W.2d at 271. It inheres in the "frustration" of receiving something other than what one paid for. And see the decision of the Oregon Supreme Court in Weigel v. Ron Tonkin Chevrolet, Co., 298 Or. 127, 690 P.2d 488 (1984), citing both of the foregoing cases and quoted extensively from Hinchliffe.
The question of "ascertainable loss" has come before the New Jersey Supreme Court in two cases. In Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475, 541 A.2d 1063 (1988), the Court concluded that plaintiff had shown no actual loss from defendant's "unconscionable" commercial practices respecting a bank loan to purchase a boat, and it denied recovery on that basis. The decision turned on the facts of the case and does not discuss the meaning of the term "ascertainable loss."
Cox v. Sears Roebuck & Co., supra, is also factually distinguishable but does suggest that the Court's previously expressed intention to read the Act liberally in favor of its intended beneficiaries applies also to its interpretation of the term "ascertainable loss." In Cox, the Court found "ascertainable loss" from repair costs incurred because of defendant contractor's wrongful acts, and also from the improper filing of a lien against plaintiff's home:
We conclude that an improper debt or lien against a consumer-fraud plaintiff may constitute a loss under the Act, because the consumer is not obligated to pay an indebtedness arising out of conduct that violates the Act.
[138 N.J. at 23, 647 A.2d 454.]
That statement is consistent with the out-of-state cases discussed above. Those decisions  particularly the extensive discussion in Hinchliffe v. American Motors Corp.  are sound. They are consistent with a reasonable, rational reading of N.J.S.A. 56:8-19, and they are also consistent with the admonition from our Supreme Court that the Consumer Fraud Act is remedial legislation and should be read liberally in favor of consumers.
Applying those standards to the facts of this case, it is clear that at least plaintiffs Reed and Koteen have suffered "ascertainable loss." For their money, they received something less than, and *91 different from, what they reasonably expected in view of defendant's presentations. That is all that is required to establish "ascertainable loss," and it is sufficient to withstand defendant's motion for summary judgment.[11]

G. THE COMMON LAW CLAIMS
Plaintiffs' complaint includes a count for common law fraud which defendant also seeks to dismiss by summary judgment. That aspect of defendant's motion does not require extensive discussion. The elements of common law fraud are well settled. They consist of
a material misrepresentation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment.
[Jewish Center of Sussex County v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981).]
The analysis set out above demonstrates the requisite misrepresentations. That they may have been subtle, and made by implication and suggestion, does not change the fact that they were misrepresentations.
That defendant was aware its representations were false, and that it intended that plaintiffs and others rely on them is reasonably inferable from the facts presented. And those facts also demonstrate that plaintiffs did rely on those representations and did purchase defendant's products, to their detriment.
*92 In short, plaintiffs have presented a prima facie case of common law fraud, as well as a violation of the Consumer Fraud Act. The submission is more than sufficient to withstand defendant's motion for summary judgment.

H. PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGEMENT
Plaintiffs have cross moved for summary judgment in their favor. That motion must also be denied.
All of the foregoing discussion is premised on plaintiffs' ability to prove the allegations they have set forth. However, for plaintiffs to obtain judgment in their favor, they must establish those contentions by a preponderance of the evidence. That, of course, they have not yet done. They will be given an opportunity to do so  but do so they must, at trial. They are not entitled to relief by way of summary judgment.
NOTES
[1] In their initial presentation, plaintiffs claimed that defendant did, in fact, treat subscription purchasers differently from those responders who did not buy subscriptions. They claimed that responses from the latter were discarded and only those including a magazine purchase were counted in defendant's sweepstakes. On that basis, plaintiffs sought a temporary restraining order enjoining defendant's scheduled sweepstake drawing just a few days before it was scheduled to take place on the "Today Show." That request was denied, and plaintiffs have since abandoned the claim of differential treatment.
[2] There is also a third type of violation, but that is not defined in Section 2. Pursuant to N.J.S.A. 56:8-4, the Division of Consumer Affairs may adopt regulations which have the force of law. A violation of any regulation will constitute a violation of the Act. Cox, supra, 138 N.J. at 18-19, 647 A.2d 454.

Plaintiffs here allege violation of a regulation requiring a direct mailer to include its street address in its solicitations. They claim that defendant is based in Newark, New Jersey, but its mailings refer only to a Florida post office box. Assuming the claim is correct, plaintiffs show no "loss" or other harm resulting to them, and the violation, if it does exist, is of no significance.
[3] On defendant's motion for summary judgment, plaintiffs, of course, are entitled to the benefit of all reasonable inferences that can be drawn from the facts presented. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74-75, 110 A.2d 24 (1954).
[4] The variation between the addressee's name, Keena Reed, and the plaintiff Cary Reed has not been explained and does not seem material.
[5] The finalist notice also includes seven new numbers (in addition to those originally sent to the addressee), which the recipient is urged to return to defendant to further enhance the chance of winning.
[6] Although the primary objective of the sweepstakes campaign is, of course, to sell magazines, plaintiffs claim that defendant actually benefits from all responses, whether or not accompanied by a subscription. Their expert notes that defendant "rents," from a supplier of mailing lists, the names of many of those to whom it sends its material. Once a response is received, however, defendant may claim ownership of the responder's name, and it need not pay further rental fees for its use. In addition, defendant itself sells its mailing lists to others and receives a higher price for names of recent responders.
[7] All of these "drop" warnings bear the signature of William Austin. Defendant's vice president, Mr. McCarthy, testified at depositions that William Austin is a fictitious name of a fictitious person.
[8] Plaintiffs' argument focuses on that portion of N.J.S.A. 56:8-2 which outlaws "unconscionable practices." However, the conduct complained of could also constitute one or more of the other "affirmative acts" proscribed by the Act  most notably deception, but perhaps fraud, false pretense, false promise, or misrepresentation as well. In addition, it might also violate the "knowing omissions" standard set out in Section 2 by constituting a knowing "concealment" or "suppression" of the actual facts relative to its sweepstakes.

None of those alternate grounds of violation has been explored by plaintiffs, and it is not clear that any of them would add anything significant to their case.
[9] Section 19 of the Act, N.J.S.A. 56:8-19, provides:

Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act ... may bring an action or assert a counterclaim therefor in any court of competent jurisdiction.
Since the "ascertainable loss" requirement limits the right to sue under the Act, it would seem to apply to injunctive relief as well as damages. In Cox v. Sears Roebuck & Co., supra, however, the Court said that a plaintiff suing under the Act who is unable to demonstrate "ascertainable loss" may nevertheless be awarded counsel fees. Cox, supra, 138 N.J. at 24-25, 647 A.2d 454.
[10] The Michigan statute refers to "loss" rather than "ascertainable loss." However, there is no reason to believe the decision would have been different had the additional word "ascertainable" been before the court.
[11] Plaintiffs also claim that "ascertainable loss" arises from their mere purchase and use of a United States postage stamp to enter defendant's sweepstakes. They note that the statute contains no de minimis exception. In that regard, see Weigel v. Ron Tonkin Chevrolet Co., supra, 298 Or. at 136, 690 P.2d at 494, indicating that a minimal loss (charging $2.89 for a razor erroneously advertised at $.89) may provide a statutory ground for relief even though the common law would have denied such a claim, because "the legislature was concerned as much with devising sanctions ... as with remedying private losses."

Defendant does not address this claim, and although plaintiffs submit the point, they do not develop it. Since the complaint will not in any event be dismissed, the issue will not be decided at this time.