849 A.2d 196 (2004)
369 N.J. Super. 402
Kenneth THIEDEMANN, Plaintiff, and
Brian Flaherty and Barbara Flaherty, husband and wife, and Yuet Lan Lam, in their own right and as on behalf of all others similarly situated, Plaintiffs-Appellants,
v.
MERCEDES-BENZ USA, LLC, f/k/a Mercedes-Benz USA, Inc., Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 3, 2004.
Decided May 27, 2004.
*197 Peter Russell Kohn, Philadelphia, PA (Berger & Montague) of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellants (Wilentz, Goldman & Spitzer, attorneys; Thomas J. Bernardo on the brief).
James F. Bennett, St. Louis, MO (Bryan Cave) of the Missouri bar, admitted pro hac vice, argued the cause for respondent (Graham, Curtin & Sheridan, attorneys; Thomas R. Curtin and Kathleen N. Fennelly on the brief).
Before Judges CARCHMAN, WECKER and WEISSBARD.
The opinion of the court was delivered by WEISSBARD, J.A.D.
Plaintiffs, Brian Flaherty, Barbara Flaherty (the Flahertys) and Yuet Lan Lam (Lam) appeal from an order of summary judgment dismissing their complaint against defendant, Mercedes-Benz U.S.A., LLC, formerly known as Mercedes-Benz U.S.A., Inc. (Mercedes). We reverse.
The original plaintiff in the underlying suit was Kenneth Thiedemann who filed a three count complaint, on his own behalf and on behalf of others similarly situated, asserting: (1) violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -20(CFA); (2) breach of the implied warranty of merchantability set forth at N.J.S.A. 12A:2-314; and (3) violation of 15 U.S.C.A. § 2310(d) of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C.A. §§ 2301-2312. Defendant denied the key allegations of the complaint and asserted forty-three affirmative defenses. Subsequently, Thiedemann's claims were voluntarily dismissed; Lam and the Flahertys became the new proposed class representatives and also pursued individual claims.
Plaintiffs filed a motion for class certification and a motion to amend the complaint to slightly change the class definition. Defendant filed two motions (one addressing the Flahertys' claims, and one addressing Lam's claims), seeking summary judgment dismissing the complaint.
After hearing oral argument on September 12, 2002, Judge Harris issued a written decision on December 31, 2002, granting summary judgment in favor of defendant dismissing plaintiffs' claims with prejudice, and denying as moot plaintiffs' motions to amend the complaint and for class certification.

I
Defendant, an agent of Daimler Chrysler AG, with corporate headquarters located in Montville, oversees sales, service, and marketing of Mercedes-Benz vehicles in the United States. It employs numerous workers at various locations throughout *198 the country, and advises and monitors independently owned dealerships that conduct the selling and leasing activities.
In their complaint, plaintiffs described the problem with defendant's vehicles, which they called the "fuel sending unit defect," as "a serious and hazardous latent defect in that the fuel sending unit will, without warning, incipiently and/or prematurely fail, such that the amount of gasoline in the fuel tank will not properly be reflected on the dashboard fuel gauge." This problem results in the sudden, unexpected, and dangerous depletion of fuel causing an operational failure of the vehicle while in use. Plaintiffs asserted in their complaint that a series of Mercedes-Benz models from 1998 to 2000 had fuelsending unit defects.
Brian and Barbara Flaherty:
The Flahertys are residents of Philadelphia, Pennsylvania. In 1999, they purchased a 1999 Mercedes-Benz C-280 in Bayside, New York, from Helms Brothers Mercedes. After experiencing problems with erratic fuel gauge readings that contributed to twice running out of gasoline, in 2000, the Flahertys brought a lawsuit in Pennsylvania under the Pennsylvania Lemon Law. In June 2000, the Flahertys settled the Lemon Law suit and released all claims regarding their 1999 Mercedes-Benz C-280 in a "key-for-key" exchange, where they continued to pay their loan on the 1999 car, but received a new replacement 2000 C-280. Upon settling the Pennsylvania case, it became clear that they had not had any out-of-pocket expenses. They did not pay to get the 1999 model repaired, and had received a free loaner car.
The Flahertys obtained their 2000 Mercedes-Benz C-280 in Delaware. After some problems with the fuel-sending unit, they traded it for a 2000 Mercedes-Benz E-320 in September 2000, paying only the difference between the new cost of the models (approximately $11,100) despite having driven the 2000 C-280 7500 miles. All repairs to the 2000 C-280 relating to any problems with the fuel gauge or fuelsending unit were done free of charge.
In February and March 2001, the Flahertys brought the E-320 in for repairs because the fuel gauge showed three-quarters of a tank of gasoline when it was actually full. Even after warranty replacement of components relating to the fuel-reporting system in the E-320, they still check the mileage using the tripometer[1] because of fear of fuel misreporting; they still feel that the car is unsafe. The last reported problem with the fuel gauge at the time of the trial court decision occurred in March 2001. All repairs relating to the fuel gauge or fuel-sending unit of the E-320 were done under warranty and at no charge to the Flahertys. They never ran out of gasoline while driving the E-320. At the time of their depositions on October 12, 2001, the Flahertys both stated that the fuel gauge was operating properly.
Yuet Lan Lam:
Lam is a resident of North Caldwell. On October 14, 1999, she leased a 2000 Mercedes-Benz ML-430 from Prestige Motors, Inc., in Paramus, New Jersey. She claimed that the vehicle stalled once in April 2000, three times in November 2000, and the last time in February 2001.
Lam testified at her deposition that she was not sure whether her fuel gauge malfunctioned during each stalling instance. Repair records for November 21, 2000, indicate a "faulty fuel pump" on one page *199 and a "faulty fuel [sic] sending unit" on another page. Each time the vehicle stalled, the dealership repaired it under warranty at no cost to her, except in February 2001 when they charged her for fuel used when they tested the vehicle. While the car was being repaired, she received a free loaner car. There is no evidence that Lam's car ever ran out of fuel. The last incident of stalling occurred in February 2001, and Lam's lease was set to expire in 2002.
By way of affidavit, plaintiffs' expert explained the fuel sending unit defect as follows:
9. Mercedes appears to take the position that its affected vehicles are safe to drive and can be reliably driven despite the defectively-designed fuel sending units that it admits to in Exhibit "B." I do not agree with this assertion. The fuel sending unit defect in these vehicles means that drivers do not reliably know how much gasoline they really have on board. The defect is silent and can manifest itself suddenly and without prior warning. The automobile's driver would have no idea that the automobile has been stricken by the defect, because there are no outward signs or symptoms when that defect occurs. Persons who are driving the affected Mercedes vehicles can randomly run out of fuel (causing engine stall) on modern high speed highways, in spite of operator-observable sufficient fuel gauge indications. With such engine stalls, aside from loss of engine drive power, both steering and braking systems can also be negatively affected. Thus, drivers affected by such random vehicle stalling risk losing safe control of their vehicles, risk their personal safety and also risk the safety of their passengers, by driving the affected vehicles.
10. No vehicle is safe or reliable to operate under such conditions. Mercedes' suggestion that drivers continue to operate these vehicles, without a warning about the above documented dangerous condition, indicates a disregard for consumer safety. By the time the defect is known to the driver, it is too late, and the driver is put into an unforeseen and dangerous situation. Compounding this defect, drivers whose cars have this defect have not been warned that this defect exists.
We need not detail all of the information uncovered in discovery which, giving plaintiffs the benefit of all favorable inferences at this stage, see Brill v. Guardian Life Insurance Company of America, 142 N.J. 520, 540, 666 A.2d 146 (1995), supports their position. That evidence demonstrated that as early as December 1997, defendant's personnel recognized and reported what was described as "a problem with fuel gauges intermittently reading inaccurately on virtually all models." The problem "has often caused owners to run out of fuel while driving." The problem was described as "critical." In February 1999, a memo described unsuccessful efforts to solve the problem, and stated "we consider this to be one of our most central issues right now, and we are desperately in need of a solution." Concern was again expressed in June 1999, with the author of the earlier memo reporting to his superiors:
As you know, MBUSA is very concerned with the status of fuel sending unit failures in the U.S. market. While this issue has been ongoing for nearly two years, failures have increased at an alarming rate in the last few months. The failures have increased to the point where some of our clients are experiencing a problem within the first 1-2 weeks following delivery of the vehicle; particularly with C-Class and CLK models.

*200 Within the U.S. market, we are experiencing significant pressures to address this issue, and address it quickly. We are told that this is only an issue in the U.S. market, and is related to U.S. fuel. I am sure you must know however, that MB Canada also is experiencing a tremendous number of failures.
In August 2000, Mercedes issued a Dealer Technical Bulletin telling all dealers that they should "replace the fuel sending unit(s) together with the instrument cluster" on C-class vehicles in case of "fuel gauge accuracy complaints," and noting that "fuel sending units continue to fail even with the latest version sending units[.]" A Mercedes official wrote again to Daimler Chrysler AG in September of 2000, reporting that the failure rate "remains unacceptably high" and requesting a "formal action plan to address this issue." Study of the defect apparently continued, but no solution was found.
According to internal Mercedes documents, the fuel sending unit defect is the number one complaint and the number one problem with all models of Mercedes vehicles included in plaintiffs' proposed class. In an internal email, one Mercedes executive described the significance of this classwide defect to both Mercedes and Daimler Chrysler AG: "He made it very clear that the # 1 issuefailing fuel sending units hasn't been resolved since 2 years and we (together with Stuttgart) haven't delivered a viable solution yet." "We are experiencing abnormally high failure rates of fuel gauge sending units with virtually all models."
A chart showed that defendant was still tracking the problem in early 2001. Defendant's warranty data base revealed that a total of 43,039 fuel sending unit failures had been reported to defendant prior to August 28, 2001. In the several years that the problem was under investigation, defendant never provided its customers with notice of the problem nor did it initiate a recall of the affected vehicles. The cost to repair the unit is $147.60 in parts and from $152 to $303.40 in labor.
Given these documents and the opinion of plaintiffs' expert, defendant concedes, for summary judgment purposes only, that the fuel sending unit is defective. Defendant's knowledge of the defect is evident.
Thus, the record demonstrated a component in many of defendant's cars embodying a defect that could not be cured. The only solution is for the unit to be replaced when the defect manifests itself, which defendant has done to date, although the replacement unit is apparently no less defective than that originally installed.
Plaintiffs claimed that summary judgment was premature because case management orders had bifurcated so-called "merits discovery" from "class-maintainability discovery," and merits discovery was unfinished. The motion judge agreed with defendant that since the case had commenced in November 2000, plaintiffs had had ample time to determine exactly what loss or damage they had suffered. They needed no "merits discovery" to illuminate circumstances that were peculiarly within their own ability to discover. Further discovery from defendant would not fill in a critical gap left by plaintiffs' illusory damages. We agree the damage issue was sufficiently developed to permit resolution on the record presented to the motion judge. The issue does not merit extended discussion. R. 2:11-3(e)(1)(E).
The motion judge concluded that damages are an essential element that must be proved to the satisfaction of the trier of facts and that no rational fact finder could conclude that plaintiffs suffered an objectively ascertainable loss or damage, even under the expansively protective legislative *201 purpose of the CFA and New Jersey's public policies affording broad protection to consumers against deceptive commercial practices. The judge concluded that the record contained neither expert proof of diminution of value of plaintiffs' cars, nor evidence of any out-of-pocket expenses causally connected with the claimed defect in defendant's vehicles. He rejected plaintiffs' attempt to attribute to themselves an unincurred cost of repair extrapolated from defendant's internal warranty remediation efforts as well as an inchoate and unsubstantiated loss of the benefit of the bargain.
At the outset, we note our disagreement with a number of the comments made by the judge in his decision, some of which were, as plaintiffs argue, unnecessary. Thus, the judge described plaintiffs' case as follows:
Essentially, what plaintiffs urge here is that they are entitled to a Mercedes-Benz motor vehicle without any flaws or glitches, without any reasonably-remediable problems, and without any of the ordinary tribulations of automobile ownership or lease: in other words, a perfect car unaffected by the laws of physics and common sense. Plaintiffs are not so entitled, and they may not seek legal remedies because of their unrealistic disappointment.
To the extent that these remarks may be read to belittle plaintiffs' claim, we emphatically disagree. We do not perceive the fuel sending unit defect as akin to a "flaw or glitch" nor an "ordinary tribulation of automobile ownership or lease." The defect has a readily apparent impact on safety. Of course, once the defect becomes known, as it did ultimately to both plaintiffs, it may be guarded against by use of the tripometer. However, the situation is potentially much more serious for the driver who experiences the problem for the first time. Without knowledge that the fuel gauge is not registering properly, the car may run out of gas and stall, perhaps in a dangerous place such as a major highway. Indeed, even after a replacement is made, the driver still remains unaware that the same defect exists, since Mercedes takes no steps to warn its customers of the repetitive and perhaps incurable nature of the problem.
Similarly, we question the judge's observation that by replacing the unit at no cost, there is revealed "nothing more than an efficiently operating consumer-complaint and remediation system" that would be "interrupt[ed] and distort[ed]" by the remedies plaintiffs seek in this action. Rather, a fairly functioning system would also include explanations of the problem and warnings to prospective and current users of the vehicles. Obviously, such notice would have a serious impact on defendant's sales.
Further, we do not, for the reasons expressed, see this case as comprising "a rather mundane series of events." As the court said in Zabriskie Chevrolet, Inc. v. Smith, 99 N.J.Super. 441, 458, 240 A.2d 195 (Law Div.1968):
For a majority of people the purchase of a new car is a major investment, rationalized by the peace of mind that flows from its dependability and safety. Once their faith is shaken, the vehicle loses not only its real value in their eyes, but becomes an instrument whose integrity is substantially impaired and whose operation is fraught with apprehension.
That observation is still true today. While there certainly can be much worse defects in a car, the defect at issue here does pose a hazard, the more so because of the consumers' absence of knowledge.
Finally, to the extent that the motion judge relied on the concept of mootness *202 in ordering dismissal of plaintiffs' action, we disagree. Plaintiffs presented sufficient evidence from which it could be inferred that the replacement units were just as defective as the original ones, thereby justifying a conclusion that the harm is "likely to recur." Middlesex County Bar Ass'n v. Parkin, 226 N.J.Super. 387, 390, 544 A.2d 433 (App.Div.), certif. denied, 113 N.J. 380, 550 A.2d 482 (1988). Indeed, if defendant's position is that there is no loss because the defective unit is always replaced at no cost to the owner, then it appears that the controversy is capable of repetition but always evading review, thereby falling within another recognized exception to the mootness doctrine. In re Conroy, 190 N.J.Super. 453, 459, 464 A.2d 303 (App.Div.1983), rev'd on other grounds, 98 N.J. 321, 486 A.2d 1209 (1985). Plaintiffs' expert opined that while it could not be predicted "exactly when or where the fuel sending unit defect will manifest itself, it is more likely than not that the defect will manifest itself within the service life of the associated vehicle." Plaintiffs' claim is not moot.

II
We now turn to the primary basis upon which the judge granted summary judgment, that plaintiffs had not established an "ascertainable loss of moneys or property" as required by the CFA. N.J.S.A. 56:8-19.
Plaintiffs advance two theories of loss. First, they contend that the cost of repair "is a perfectly valid indicator (and measure) of damages in a consumer fraud case such as this." Of course, the cost of repair in this case can only be the cost to defendant, since the cars were repaired at no cost to plaintiffs. In support of this argument, plaintiffs place their primary reliance on Cox v. Sears Roebuck & Company, 138 N.J. 2, 22-23, 647 A.2d 454 (1994). In Cox, the plaintiff contracted with Sears Roebuck & Co. (Sears) to renovate his kitchen. Id. at 7, 647 A.2d 454. When the job was finished, problems included unattractive renovations, incomplete and substandard electrical work that "failed to comply with building and electrical codes and home-repair regulations," buckled flooring, lopsided installation of a microwave hood and microwave, and mismatched and cracked cabinet trim. Id. at 8-9, 647 A.2d 454. Further, Sears had never obtained the necessary permits for the work, in violation of applicable regulations. Id. at 20, 647 A.2d 454.
The Court found that Sears' failure to secure the permits, which would have triggered the required inspections and revealed the shoddy and hazardous conditions, visited an ascertainable loss upon the plaintiff. Id. at 22, 647 A.2d 454. The plaintiff was not required to actually spend the money to make the repairs before becoming entitled to pursue a claim under the CFA. Ibid. Testimony specifically addressed the cost of repairs, and the trial court found that the plaintiff had adequately demonstrated those costs to be $6830, the cost to repair the kitchen. Id. at 22-23, 647 A.2d 454.
Based on Cox, plaintiffs' claim that the cost of repair is a valid indicator and measure of damages. We agree, but the facts in this case are distinguishable because plaintiffs have not quantified an exact amount of damages. While the cost to repair the kitchen in Cox could be exactly determined, here, defendant paid for all repairs under warranty for fuel gauges and fuel-sending units, and plaintiffs have not set forth any figures for the cost to them of possible future repairs.
Plaintiffs' second theory, which they contend the judge "either misapprehended or erroneously ignored," is that they are being forced to drive "vehicles with a defectively designed fuel sending unit that *203 defendant intentionally concealed from them," "when they did not bargain for vehicles with such problems." They argue that the failure to receive the benefit of one's bargain "is a cognizable ascertainable loss for consumer fraud act purposes." Implicit in this argument is their claim that the units will fail within the service life of the vehicle. For the reasons that follow, we have no need to resolve this issue.[2]
There is no doubt that the statute itself, and the several seminal cases interpreting it, require a showing of ascertainable loss. See Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 473, 541 A.2d 1063 (1988); Cox, supra, 138 N.J. at 21-23, 647 A.2d 454; Weinberg v. Sprint Corp., 173 N.J. 233, 249-51, 801 A.2d 281 (2002); Truex v. Ocean Dodge, Inc., 219 N.J.Super. 44, 51-52, 529 A.2d 1017 (App.Div. 1987); Feinberg v. Red Bank Volvo, Inc., 331 N.J.Super. 506-11, 752 A.2d 720 (App. Div.2000). Here, as noted, we agree with defendant that plaintiffs' loss cannot fairly be measured by the money defendant has to expend to replace the fuel sending unit component. Nevertheless, we conclude that plaintiffs' proofs sufficiently established the likelihood of an ascertainable loss for summary judgment purposes.
To repeat, plaintiffs have a car with a defect in a significant component, which defect is present in every replacement of that component, and will likely manifest itself at some future time. We believe that common knowledge, indeed common sense, compels a conclusion that the value of the vehicle is impaired to a measurable, if presently unknowable degree. Can it possibly be doubted that if the Flahertys sought to sell their vehicle on the used car market, and advised prospective buyers of the fuel-sending unit problem, that they would receive less than if the vehicle had no such defect? We think not. This proposition is "so universally known that [it] cannot reasonably be the subject of dispute," N.J.R.E. 201(b)(1), and is, therefore, subject to judicial notice by us. N.J.R.E. 202(b). The loss we posit is not simply a loss of consumer expectation or an unquantifiable benefit-of-the-bargain loss. There is more here than just a sense of unease in driving a car that has a potential problem that could impact on safety. There is a loss in value, not simply a loss of expectation. Of course, to recover damages, plaintiffs will have to quantify that loss in some manner, but that proof need not be offered at this stage in order to defeat summary judgment.
Plaintiffs will, of course, have to prove at trial the loss we posit. However, even if the fact-finder rejects their damage claims, *204 they would still be entitled to injunctive relief and attorneys fees if they succeed in establishing a CFA violation. See Cox, supra, 138 N.J. at 24, 647 A.2d 454; Weinberg, supra, 173 N.J. at 253, 801 A.2d 281; Cuesta v. Classic Wheels, Inc., 358 N.J.Super. 512, 523, 818 A.2d 448 (App.Div.2003). For now it suffices that the grant of summary judgment was in error.
Since the case must be remanded, the motion judge will have to resolve plaintiffs' motions for class certification and to amend the complaint, which he did not address once having found the underlying cause of action to be deficient. See Cowen v. Bank United of Tex. F.S.B., 70 F.3d 937, 941 (7th Cir.1995).
Reversed and remanded.
NOTES
[1] "Tripometer," refers to the odometer that can be reset back to zero by pushing a button, to show the distance traveled since the button was reset.
[2] Plaintiffs' benefit of the bargain loss theory does find support in Miller v. American Family Publishers, 284 N.J.Super. 67, 88-91, 663 A.2d 643 (Ch.Div.1995), which we cited with approval in Union Ink Co., Inc. v. AT & T Corp., 352 N.J.Super. 617, 646, 801 A.2d 361 (App.Div.), certif. denied, 174 N.J. 547, 810 A.2d 66 (2002); see also Chattin v. Cape May Greene, Inc., 243 N.J.Super. 590, 581 A.2d 91 (App.Div.1990), (quoting jury charge that incorporated benefit of bargain approach) aff'd o.b., 124 N.J. 520, 591 A.2d 943 (1991). As Miller noted, this approach to the concept of loss in consumer fraud cases finds support in other jurisdictions. See Hinchliffe v. American Motors Corp., 184 Conn. 607, 440 A.2d 810, 812 (1981), aff'd after remand, 192 Conn. 252, 470 A.2d 1216 (1984); Service Rd. Corp. v. Quinn, 241 Conn. 630, 698 A.2d 258, 265 (1997); Kim v. Magnotta, 49 Conn.App. 203, 714 A.2d 38, 43 (1998), rev'd on other grounds, 249 Conn. 94, 733 A.2d 809 (1999); Mayhall v. A.H. Pond Co., 129 Mich.App. 178, 341 N.W.2d 268 (1983); Connick v. Suzuki Motor Co. Ltd., 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 595 (1997); Schiffner v. Motorola, Inc., 297 Ill.App.3d 1099, 232 Ill.Dec. 126, 697 N.E.2d 868, 874-75 (1998), cert. denied, 526 U.S. 1017, 119 S.Ct. 1250, 143 L.Ed.2d 348 (1999); Perona v. Volkswagen of Am., Inc., 292 Ill.App.3d 59, 225 Ill.Dec. 868, 684 N.E.2d 859, 866 (1997).