801 A.2d 361 (2002)
352 N.J. Super. 617
UNION INK CO., INC., and Marci Bloom, Plaintiffs-Appellants,
v.
AT&T CORP., and AT&T Wireless Services, Inc., Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 2001.
Decided June 28, 2002.
*365 William J. Pinilis, Newark, argued the cause for appellants (Kaplan, Kilsheimer & Fox, attorneys; Mr. Pinilis, with Laurence D. King of the California bar, on the brief).
Douglas S. Eakeley, Roseland, argued the cause for respondents (Lowenstein Sandler, attorneys; Mr. Eakeley, with Howard Spierer, of counsel; Mr. Eakeley and Michael A. Norwick, on the brief).
Before Judges KESTIN, STEINBERG and ALLEY. *362 *363
*364 The opinion of the court was delivered by KESTIN, J.A.D.
Plaintiffs appeal from the trial court's order dismissing the class action complaint "pursuant to federal pre-emption principles" applied under 47 U.S.C.A. § 332(c)(3), a section of the Communications Act, 47 U.S.C.A. § 151 to § 1110. As originally filed, the complaint alleged violations of the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -106; common law fraud, breach of contract, unjust enrichment, and negligent misrepresentation. Plaintiffs have since withdrawn the breach of contract and unjust enrichment claims. In considering whether plaintiffs' remaining claims are pre-empted by federal law we must begin with a detailed understanding of what they entail.
The gravamina of those remaining claims are based on plaintiffs' assertions that defendants misrepresented the quality and reliability of their cellular phone service, the "Digital One Rate" plan (the Plan), in violation of defendant's statutory and common law duties. In general, the complaint alleges false representations in defendants' advertisements that subscribers to the Plan would receive the same quality of cellular phone service as they had with conventional, land-line phone service:
Defendants advertised the Plan, as being so reliable, economical and accessible that it is a viable alternative to traditional telephone service provided over telephone wires. In fact, the AT&T Defendants are currently airing radio advertisements which represent to the consuming public that the Plan is so reliable and economical that it is a suitable, viable and legitimate alternative to wired based telephone service. Specifically, the AT&T Defendants advertise that with the Plan, "you can make your wireless phone your only phone."
More particularly, the complaint alleges that certain, described representations made by defendants were false and misleading:

*366 [T]he Ads represent that the Plan utilizes not only the "largest digital network in North America" but also
other wireless carriers' digital and analog networks and, therefore, [is] capable of providing service to subscribers almost anywhere in America. The combination of AT&T's vast digital network and the multi-networked capabilities of the phones make AT&T Wireless the only company that can offer such simple and flexible wireless service nationwide.

* * *
The Plan is not "capable of providing service to subscribers almost anywhere in North America." This is because the AT&T Defendants accepted, solicited and continued to solicit and accept too many subscribers for the limited number of channels in the AT&T Defendants' digital network. At the same time and without warning, the AT&T Defendants ceased providing subscribers with alternative and "backup" use of analog service when digital service was unavailable. The discontinuation of analog service to subscribers of the Plan is significant. According to a July 19, 1999 article in the New York Times, "[a]lthough the Cellular Telecommunications Industry Association estimates 70 percent to 75 percent of the land area of the United States has wireless coverage, there is greater coverage for analog systems than for digital. [Thus,] [m]any wireless operators use the analog network as a fall-back for digital customers." Because the Plan had and has an insufficient digital network to adequately service its ever-expanding subscriber base and because the AT&T Defendants discontinued analog service to subscribers of the Plan, the Plan is completely unreliable.
[ ] As a result, subscribers regularly experience numerous problems that render the Plan's service virtually unusable. In particular, subscribers are frequently disconnected involuntarily, unable to connect with the service, and therefore unable to place calls, and do not automatically receive credit for involuntary disconnections when unable to reconnect within five minutes of such involuntary disconnections. Also, subscribers often do not receive calls placed to them. Compounding this problem, callers to subscribers are often not placed in the subscriber's voice mail system. Instead, those callers hear a pre-recorded message. This is a significant problem because the AT&T Defendants represented and represent to subscribers that all calls which are not received will be automatically... placed into the subscriber's voice mail system.
The complaint goes on to charge knowing misrepresentation on defendants' parts:
Defendants knew or should have known and failed to disclose and currently know and are failing to disclose that the service did not and does not have sufficient capacity to reliably service subscribers. Thus, the AT&T Defendants cannot deliver upon the promises and representations relating to the capacity of the service as set forth in the Ads and otherwise. In fact, according to a July 19, 1999 article in the Wall Street Journal, "AT&T has publicly conceded that demand initially outpaced its cellular capacity in the crucial New York area." Indeed, on May 9, 1999Mother's Daysubscribers to the Plan in Northern New Jersey and New York were without service for more than twenty-two hours when the service malfunctioned due to heavy Mother's Day volume.

*367 [ ] Nevertheless[,] and despite their knowledge and acknowledgments that the service does not have the capacity to keep up consumer demand for the Plan, the AT&T Defendants continue to this day their massive advertising campaign to solicit additional subscribers to the Plan. In fact, knowing that they cannot provide adequate service to the existing subscribers of the Plan, the AT&T Defendants continue to solicit consumers with a massive multimedia advertising campaign. Upon information and belief, although the AT&T Defendants are aware and have been aware that there is and has been insufficient capacity to service the current subscribers to the Plan, the AT&T Defendants accept over 100,000 new subscribers to the Plan each month.
The contentions continue with specific examples of advertising alleged to be false. The complaint then asserts:
There is no mention or disclaimer in the plethora of information about the Plan on AT&T's website or in Defendants' advertisements of the Plan concerning, among other things, an inability to access ... the service, delays in the availability of the system as indicated by a system busy signal, involuntar[y] disconnections in areas that are described as within the AT&T wireless network and consequent charges for reconnection, and/or the failure to send all unreceived calls to voice mail.
[ ] The AT&T Defendants' statements described above were deceptive because, inter alia, they concealed or downplayed the unavailability of access to the service and the likelihood that increase[d] volume of cellular phone usage would surpass the capacity of the AT&T wireless network to provide on-demand service to many of the Plan subscribers.
The complaint goes on to describe specific types of usage problems, alleging that plaintiffs and other consumers could not depend upon the Plan to provide the services advertised, i.e., that particular representations made by defendants were untrue. To the extent defendants' representations could not be fulfilled because of the system's incapacity to handle the volume of traffic, the complaint asserts that
the Plan's capacity is insufficient to adequately provide for the current subscriber base much less additional subscribers intending to utilize the service as their only means for telephone communications. And, the AT&T Defendants are adding thousands and thousands of new subscribers every month notwithstanding that the more subscribers that are added, the less effective the service becomes.
Plaintiffs had not yet sought certification of the class action pursuant to R. 4:32-2 before defendants moved to dismiss the complaint on the alternative grounds that all pleaded causes of action were pre-empted by federal law and that the complaint failed to state a claim upon which relief could be granted. The motion judge initially granted the motion on the pre-emption ground. Plaintiffs then moved for reconsideration on the basis of new legal developments. The motion judge granted that motion, reconsidered the matter in the light of the new developments, and reaffirmed his previous determination. The reasons for both trial court dispositions were stated in oral opinions.
For the limited purposes of the underlying motion to dismiss on federal pre-emption grounds, i.e., for lack of jurisdiction over the subject matter, R. 4:6-2(a), or for failure to state a claim upon which relief can be granted, R. 4:6-2(e), we must accept as true the allegations of the complaint. Printing Mart-Morristown v. *368 Sharp Elecs. Corp, 116 N.J. 739, 746, 563 A.2d 31 (1989).
With regard to the pre-emption issue, plaintiffs contend that the trial court erred in dismissing those portions of the complaint that sought statutory or common law damages based upon the false advertising alleged. They argue that, under recent cases decided by federal and state courts as well as two pronouncements of the Federal Communications Commission (FCC), while the states may not regulate the rates charged by providers of cellular service, state law continues to govern other terms and conditions of defendants' relationships with their subscribers, including advertising and the causes of action that arise therefrom. Defendants respond that the authority to award damages for false advertising necessarily affects rates to be charged by providers of cellular service, and also implicates other terms and conditions of providers' businesses such as the capacities of their systems to deliver cellular telephone service.
An historical perspective is essential to an appreciation of the significance of the issues raised by the parties. We begin with the federal legislation deregulating cellular service, also known as Commercial Mobile Radio Service (CMRS).
As part of the Omnibus Budget Reconciliation Act of 1993, Pub.L. 103-66, 107 Stat. 312 (1993), Congress amended the Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended throughout 47 U.S.C.A.), to "dramatically revise the regulation of the wireless telecommunications industry, of which cellular telephone service is a part." Connecticut Dept. of Pub. Util. Control v. Fed. Communications Comm'n., 78 F.3d 842, 845 (2d Cir. 1996). The pertinent statutory language provides that
no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.

[47 U.S.C.A. § 332(c)(3)(A).]
A report of the House of Representatives Budget Committee commenting on the proposed legislation states:
Section 332(c)(3) provides that state or local governments cannot impose rate or entry regulation on private land mobile service or commercial mobile services; this paragraph further stipulates that nothing here shall preclude a state from regulating the other terms and conditions of commercial mobile services. It is the intent of the Committee that the states still would be able to regulate the terms and conditions of these services. By "terms and conditions," the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (e.g., zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or such other matters as fall within a state's lawful authority. This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under "terms and conditions."
[H.R. Rep. No. 103-111 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 588.]
We are called upon to determine in this case the extent to which the statutory language expressly pre-empts a state court from awarding damages against providers of cellular telephone service based upon state statutes dealing with consumer fraud or under the state's common law *369 regarding fraud or negligent misrepresentation, i.e., for false or misleading advertising. The Supremacy Clause in Article VI, clause 2 of the United States Constitution commands state law to yield to an act of Congress whenever federal legislation has fully occupied a subject matter field or where there is a conflict between federal law and state law. See, e.g., Crosby v. National Foreign Trade Council, 530 U.S. 363, 372, 120 S.Ct. 2288, 2293, 147 L. Ed. 2d 352, 361 (2000); Turner v. First Union Nat'l Bank, 162 N.J. 75, 87, 740 A.2d 1081 (1999); Hous. Auth. and Urban Redevelopment Agency of Atlantic City v. Spratley, 327 N.J.Super. 246, 254, 743 A.2d 309 (App.Div.1999). The underlying issue in any pre-emption case is whether Congress intended that federal law supersede state law. Ibid. Although pre-emption may be implied, or arise by conflict, R.F. v. Abbott Labs., 162 N.J. 596, 618, 745 A.2d 1174 (2000), the "inquiry is simple when Congress has expressly defined the extent to which the statute preempts state law." Spratley, supra, 327 N.J.Super. at 254, 743 A.2d 309. The issue here is express pre-emption.
Pre-emption determinations tend to be "very fact-sensitive." Abbott Labs., supra, 162 N.J. at 629, 745 A.2d 1174. Pre-emption is not lightly found; the intent of Congress to displace the historic police powers of the states must be "clear and manifest." Franklin Tower One v. N.M., 157 N.J. 602, 615, 725 A.2d 1104 (1999) (quoting Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 605, 111 S.Ct. 2476, 2482, 115 L. Ed.2d 532, 543 (1991)).
As noted by the parties and by the motion judge, several courts in other jurisdictions have addressed the pre-emptive scope of section 332(c)(3)(A), and the FCC has twice expressed its views on the issue in some detail. The FCC's views as the administrative agency charged with administering the statute are entitled to considerable respect. We customarily defer to the administering agency's interpretation of a statute provided it is not manifestly unreasonable or at variance with plain statutory terms or judicial interpretations. See In re Pub. Serv. Elec. & Gas Co. Rate Unbundling, 167 N.J. 377, 384, 771 A.2d 1163 (2001); see also Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 739, 116 S.Ct. 1730, 1733, 135 L. Ed. 2d 25, 30 (1996) (holding, as a matter of federal law, that the courts should "defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering") (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L. Ed. 2d 694 (1984)). Defendants do not dispute this principle. Rather, they claim that the two pronouncements of the FCC on the subject favor their position.
Even before the advent of more current developments, a trio of federal district courts in the Third Circuit alone, in remanding to state courts previously removed class action complaints involving other cellular telephone systems, held contrary to defendants' position on the pre-emption question in cognate factual situations. Apart from some issues not pertinent here, those tribunals held that state courts had jurisdiction to adjudicate consumer fraud claims arising out of the provider's failure to disclose that customers would be billed for calls when initiated, rather than when a connection was made, and for failing to disclose the practice of "rounding up."[*]Sanderson, Thompson, *370 Ratledge & Zimny v. AWACS, Inc., 958 F.Supp. 947 (D.Del.1997); In re Comcast Cellular Telecomms. Litig., 949 F.Supp. 1193 (E.D.Pa.1996); DeCastro v. AWACS, Inc., 935 F.Supp. 541, appeal dismissed, 940 F.Supp. 692 (D.N.J.1996). All three of those courts held specifically that claims based on false advertising or nondisclosure were not pre-empted. See Sanderson, supra, 958 F.Supp. at 955. All cited both 47 U.S.C.A. § 332(c)(3)(A), and 47 U.S.C.A. § 414, the "savings clause" of the Communications Act which states, in pertinent part, that nothing contained therein "shall in any way abridge or alter the remedies now existing at common law or by statute." § 414. In the earliest of the three cases, the court summarized the inquiry and its conclusion:
As emphasized repeatedly in Supreme Court and Third Circuit jurisprudence, to find complete pre-emption, there must be an affirmative and clear indication of Congress'[s] intent that the Communications Act provides an exclusive federal remedy for the plaintiffs' claims. Both the general survival clause found in 47 U.S.C. § 414 and the pre-emption provision found in the 1993 amendments governing cellular telephone service providers, 47 U.S.C. § 332(c)(2)(A) [sic], along with explicit legislative history, signify just the opposite. This Court finds persuasive those cases holding that the Communications Act does not displace, but rather supplements, state law claims against cellular telephone service providers for consumer fraud, misrepresentation, breach of contract, and unfair billing practices.

[DeCastro, supra, 935 F.Supp. at 554.]
In at least one instance, a state court has declined to dismiss a class action complaint charging AT&T with consumer fraud based on the company's failure to disclose that it rounded up charges to the next full minute. Tenore v. AT&T Wireless Servs., 136 Wash.2d 322, 962 P.2d 104 (1998), cert. denied, 525 U.S. 1171, 119 S.Ct. 1096, 143 L.Ed.2d 95 (1999). There, AT&T raised the same argument it presents here: that the plaintiffs'"request for monetary damages requires a court to retroactively establish new rates in determining damages, which, in effect, is state rate-making explicitly preempted by 47 U.S.C. § 332(c)(3)(A) of the FCA." Id. at 112. In holding for the plaintiffs, the Supreme Court of Washington relied on Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 96 S.Ct. 1978, 48 L. Ed.2d 643 (1976), which had concluded that state courts possessed the jurisdictional authority to hear a claim that an airline's failure to disclose its practice of overbooking constituted fraudulent misrepresentation. See Tenore, supra, 962 P.2d at 114. In Nader, the United States Supreme Court had held that an award of damages was not tantamount to a court substituting its judgment for an administrative agency's decision on the reasonableness of a rate. 426 U.S. at 299-300, 96 S.Ct. at 1985, 48 L. Ed.2d at 652. Rather, "any impact on rates that may result from the imposition of tort liability or from practices adopted by a carrier to avoid such liability would be merely incidental." Id. at 300, 96 S.Ct. at 1985, 48 L.Ed.2d at 652. Applying the principles set forth in Nader, the court in Tenore reasoned:
Appellants do not attack the reasonableness of AT & T's practice of rounding up call charges. They challenge *371 only nondisclosure of the practice. Nader addresses the precise issue now before this Court. We consider it applicable authority.
There is sufficient reliable authority for this Court to conclude that the state law claims brought by appellants and the damages they seek do not implicate rate regulation prohibited by Section 332 of the FCA. The award of damages is not per se rate regulation, and as the United States Supreme Court has observed, does not require a court to "substitute its judgment for the agency's on the reasonableness of a rate." Any court is competent to determine an award of damages.
[962 P.2d at 115 (quoting Nader, supra, 426 U.S. at 299, 96 S.Ct. at 1985, 48 L. Ed.2d at 652).]
The FCC comprehensively addressed the issue for the first time in In re Southwestern Bell Mobile Sys., Inc., 14 F.C.C.R. 19,898, 1999 WL 1062835. There a CMRS provider sought a declaratory ruling that failure to disclose the rounding up practice did not violate state consumer fraud laws. The FCC began by recognizing that "in recent years numerous class action law suits have been filed in state and federal courts contending that the billing, advertising and other practices of cellular carriers and other CMRS providers violate state contractual and consumer fraud laws, and that there is substantial uncertainty whether and to what extent such court actions are precluded by Section 332(c)(3) of the Act." Id. at ¶ 5 (footnote omitted). The FCC received comments from a number of companies in the industry, including defendants. Id. at ¶ 18. The FCC agreed with the providers that states do not have the authority to regulate certain aspects of the CMRS service, but it disagreed with the proposition "that state contract or consumer fraud laws relating to the disclosure of rates and rate practices have generally been preempted with respect to CMRS." Id. at ¶ 23. The Commission held: "Such preemption by Section 332(c)(3)(A) is not supported by its language or legislative history." Ibid. However, the Commission declined to determine whether a state court damage award constituted rate regulation, since that was the subject of a pending petition for a declaratory ruling by the Commission recently filed by a consumer group known as Wireless Consumers Alliance. Id. at ¶ 24.
In reaching his conclusion that federal pre-emption principles applied, the motion judge in this case relied on the next decisional development in the subject matter field, Bastien v. AT&T Wireless Servs., Inc., 205 F.3d 983 (7th Cir.2000), in which the plaintiff had asserted violations of Illinois's consumer fraud law based on the defendant's enrollment of subscribers assertedly without building the necessary infrastructure, then allegedly misrepresenting the quality and benefits of its products and services and concealing that it lacked the capacity to handle the volume of cellular calls that it actually received. The Seventh Circuit Court of Appeals viewed the complaint as a direct attack on the defendant's rates and its right to enter the Chicago market, claims which "tread directly on the very areas reserved to the FCC: the modes and conditions under which AT&T Wireless may begin offering service in the Chicago market." Id. at 989. In that court's view, granting the relief requested in the complaint would have had the effect of altering "the federal regulation of tower construction, location and coverage, quality of service and hence rates for service." Ibid.
Should the state court vindicate Bastien's claim, the relief granted would necessarily force AT & T Wireless to do more than required by the FCC: to *372 provide more towers, clearer signals or lower rates. The statute specifically insulates these FCC decisions from state court review.

[Ibid.]
Agreeing with the Bastien court, the motion judge reasoned that plaintiffs' proofs in this suit would "necessarily implicate questions about infrastructure, [and] questions about quality of service," and he distinguished Bastien from cases addressing the provider's failure to accurately disclose rates. He noted that, inevitably, the jury "will be called upon ... to consider, then reflect upon, and then balance evidence that touches and affects questions of infrastructure." The judge opined that those issues should not be considered by a jury in state court.
Within a few weeks after the decision in Bastien, state courts in California and New York held that claims sounding in breach of contract touched upon rates and were therefore pre-empted, but that allegations concerning nondisclosure were actionable. Ball v. GTE Mobilnet, 81 Cal. App.Ath 4th 529, 96 Cal.Rptr.2d 801 (2000); Naevus Int'l, Inc. v. AT & T Corp., 185 Misc.2d 655, 713 N.Y.S.2d 642 (Sup.Ct. 2000), modified, 283 A.D.2d 171, 724 N.Y.S.2d 721 (App.Div.2001). The plaintiffs in Ball had complained about being charged for noncommunication time and charges being rounded up, as well as about the failure to disclose those charges. 96 Cal.Rptr.2d at 803-04. Construing Bastien as precluding restitution for poor quality of services, since that impacted on the rates charged, the court held that section 332(c)(3)(A) "pre-empts the plaintiffs' claims to the extent that plaintiffs challenge the defendants' charging for noncommunication time, including rounding up." Id. at 809. However, claims of concealment, inadequate disclosure or misrepresentation were not pre-empted because the statute allows state regulation of other terms and conditions. Id. at 810-11 (citing Tenore, supra).
The complaint in Naevus was, in all essential respects, identical to the complaint before us in this matter. The plaintiffs represented a class consisting of all persons who subscribed to the very plan involved in this case, alleging poor service and false advertising. With respect to the breach of contract claim, the complaint alleged that "plaintiffs are unable to obtain the full benefits for which they have paid and that defendants have failed to provide promised services." 713 N.Y.S. 2d at 644. In support of the false advertising claim, the complaint alleged that "defendants bombarded the media with advertising which described the [P]lan as exceptionally reliable, simple, and unparalleled while they de-emphasized or kept secret the multiple existing problems with the service." Ibid.
Citing Bastien, the trial court in Naevus held that the breach of contract claim was pre-empted. Id. at 645. "If, as plaintiffs suggest, state courts are permitted to award compensatory damages to dissatisfied customers, then entities other than the Federal Communications Commission and the federal courts could determine the monetary value of services already received by customers and thereby regulate what can be charged for the levels of services complained of." Ibid. However, the court held that allegations of deceptive acts and practices actionable under New York's consumer fraud statute were not pre-empted, partly because section 332(c)(3)(A) allows states to regulate other terms and conditions, and partly because the savings clause established Congress's intent to preserve state regulation over other consumer protection matters. Ibid. "Like the cases involving a failure to disclose certain billing practices, plaintiffs' *373 statutory claims do not require the court to engage in retroactive rate-setting." Id. at 645-46. The trial court judge in Naevus expressly disagreed with the motion judge's unpublished opinion in this case.
On appeal, the New York Appellate Division modified the Naevus result in certain minor particulars, but it upheld the trial court's refusal to dismiss the consumer fraud law claims, since they are "precisely the types of State law claims that are not preempted." 724 N.Y.S.2d at 723.
In August 2000, in In re Wireless Consumers Alliance, Inc., 15 F.C.C.R. 17,021, 2000 WL 1140570 (2000), the FCC addressed the question it had left open in Southwestern Bell, supra: whether a state court award of damages based on false advertising would amount to rate regulation that was pre-empted by section 332(c)(3)(A). Proceedings in a California case, Spielholz v. Superior Court, 86 Cal. App.4th 1366, 104 Cal.Rptr.2d 197 (2001), had been stayed pending the FCC's opinion on a petition filed by Wireless Consumers Alliance. See In re Wireless Consumers Alliance, Inc., supra, 2000 WL 1140570 at ¶ 3. The underlying class action complaint alleged that CMRS providers had falsely advertised a "seamless calling area," devoid of "dead zones," within Southern California. Spielholz, supra, 104 Cal.Rptr.2d at 200. Before the FCC, the Wireless Consumers Alliance argued that state courts throughout the country had issued inconsistent rulings. See Wireless Consumers, supra, 2000 WL 1140570 at ¶ 3. Many major CMRS providers, as well as consumer groups and attorneys general from three states, filed comments with the FCC. Id. at ¶ 7. Relying heavily on Nader and Tenore, the FCC concluded: "A state court, by awarding damages to customers damaged by a CMRS provider's breach of contract or fraud violation, would not per se be engaged in ratemaking prohibited by Section 332(c)(3) of the Communications Act." Id. at ¶ 38, 962 P.2d 104. The agency found it unnecessary to rely on § 414, because it concluded that "section 332 does not generally preempt state court award of monetary damages", and thus there is "no inherent conflict between state common law or statutory remedies and the Communications Act." Id. at ¶ 37, 962 P.2d 104. The agency expressly rejected AT&T's claim that Bastien was controlling. Id. at ¶ 28.
Instead, we read Bastien as standing for the more general proposition, with which we agree, that state law claims may, in specific cases, be preempted by Section 332. We also read Bastien as standing for the proposition that it is the substance, not merely the form of the state claim or remedy, that determines whether it is preempted under Section 332.

[Ibid. (footnote omitted).]
After the FCC issued its opinion, the California Court of Appeal in Spielholz rejected AT&T's argument that awarding damages for falsely advertising the quality of services constitutes rate regulation because a jury would necessarily evaluate the value of the services provided by the carrier. 104 Cal.Rptr.2d at 200.
Section 332(c)(3)(A) does not disclose a congressional intent to preempt state court monetary awards that may require a determination of the value of services provided but do not directly regulate rates. We presume that if Congress had intended to preempt such state law remedies, it would have expressly so stated. Not only does the Communications Act not so state, but it states that it generally does not preclude state law remedies. (§ 414).

[Id. at 203.]
The court reasoned that: "A judicial act constitutes rate regulation only if its principal purpose and direct effect are to control *374 rates." Id. at 204. Relying on Nader, the court stated:
We agree in principle with the distinction drawn in those cases between claims that directly challenge the rate charged and claims that challenge some other practice, such as false advertising. A monetary award based on the latter type of claim would affect the rate charged only incidentally and is not a direct price control or rate regulation.

[Ibid.]
Citing the FCC opinion in Wireless Consumers, the court added that "the availability of state law remedies is consistent with the 1993 amendments' objective to achieve maximum benefits for consumers and providers through reliance on the competitive marketplace, in which state law duties and remedies ordinarily are enforceable." Id. at 205. The court disagreed with Bastien, in part because of the Seventh Circuit's reliance on the filed-rate doctrine, which was inapplicable to CMRS, and in part because it disagreed with the Seventh Circuit's conclusion that "a challenge to service quality necessarily attacks the reasonableness of rates approved by the FCC." Id. at 207-08.
For several reasons, including the array of authority on the legislative, administrative and judicial levels contrary to the motion judge's views, we conclude he erred in holding that plaintiffs' state law consumer fraud, common law fraud and negligent misrepresentation claims are pre-empted by federal law. The weight of authority is not to be measured by the quantity of decisions reaching a particular result, but rather by the logical force of the decisions reached. Thus, while a trial court judge's adherence to a minority view on a question of law is to be treated with respect at all times within the bounds of the limited deference accorded trial court interpretations of law, see Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 372, 734 A.2d 721 (1999), we are obliged to take into account the contrary views expressed by so many other tribunals at various levels of decision-making.
In determining whether state law has been pre-empted by federal law, "presumption[s] one way or the other" are of no assistance. See New York v. Federal Energy Regulatory Comm'n, 535 U.S. ___, ___, 122 S.Ct. 1012, 1023, 152 L. Ed.2d 47, 63 (2002). The question is always one of particular congressional intent. Ibid.; see also, e.g., Sprint Spectrum v. Borough of Upper Saddle River, 801 A.2d 336, 352 N.J.Super. 575 (App.Div. 2002).
The intent of Congress regarding the particular issues before us has been stated with sufficient clarity to command the almost uniform recognition of the administrative bodies and courts that have touched the issues. It is that the Communications Act should not supplant state law regarding claims that do not bear directly on rates or entry into the field of mobile telecommunication. Those rules of law that, generally, govern the relationships between parties to consumer transactions are singled out for particular preservation.
In addition to the flaw of rejecting most of the authorities which have reflected on the issues in favor of the rather singular legal result reached in Bastien regarding the particular issues raised here, the motion judge seemed unaffected by this State's public policies affording broad protection to consumers against deceptive commercial practices. See Blatterfein v. Larken Assocs., 323 N.J.Super. 167, 179, 732 A.2d 555 (App.Div.1999) ("The Consumer Fraud Act is written broadly, in order to protect the public. Its purpose is to eliminate `sharp practices and dealings in the marketing of merchandise and real estate.' As remedial legislation, it is to be liberally construed in favor of consumers." *375 (citations omitted)); see also, e.g., Lemelledo v. Beneficial Management Corp. of America, 150 N.J. 255, 265, 696 A.2d 546 (1997) (noting that "merchandise" is broadly defined under the Consumer Fraud Act as to include the sale of credit); Marascio v. Campanella, 298 N.J.Super. 491, 498, 689 A.2d 852 (App.Div.1997) (holding that a "commercially owned, unoccupied, part residential, part commercial property qualifies as a residential, non-commercial property for purposes of the Act and its regulations"); Miller v. American Family Publishers, 284 N.J.Super. 67, 83-84, 663 A.2d 643 (Ch.Div.1995) (noting that magazine subscription/sweepstakes scheme fell within ambit of Act's proscribed "unconscionable commercial practices" even though the program explicitly stated that no purchase was required to enter or win).
While, typically, the character or strength of a state's public policies have no bearing upon the question whether state law has been pre-empted by federal statutes or regulations, see American Civil Liberties Union of New Jersey v. County of Hudson, 352 N.J.Super. 44, 73, 799 A.2d 629 (2002) (observing that "the question is... never whether the supersession is palatable, but only one of paramountcy of the federal interest"), a state court should not sacrifice the public policies of the State to some ephemeral view of the federal interest which is at variance with the considered opinions of the administrative agency charged with overseeing the subject matter field, as well as those of most of the courts which have addressed the issues.
We question, on its face, the motion judge's conclusion that allowing plaintiffs' consumer fraud, common law fraud, and negligent misrepresentation claims to proceed would have a sufficiently close effect on the setting of rates as to be barred. Defendants have argued here as elsewhere, see, e.g., Spielholz, supra, 104 Cal.Rptr.2d at 201, that trial of plaintiffs' claims would "require the court or a jury to evaluate the quality of AT&T Wireless's service, and decide what that service was worth." Even if that argument were seen to have factual provenance, it is legally immaterial. The measure of damages in a consumer fraud case is the difference between the value of what was promised and what was received, that is, what the customer would have received had the defendants' representations been accurate. Chattin v. Cape May Greene, Inc. (II), 243 N.J.Super. 590, 605, 581 A.2d 91 (App.Div. 1990), aff'd o.b., 124 N.J. 520, 591 A.2d 943 (1991). In assessing damages, a jury's determination of the value of what was received is not rate regulation. As the FCC has explained, "there is no necessary correspondence between the indirect effect that monetary liability may have on a company's behavior and the direct effect that a statute or a regulatory rate requirement will have on that behavior." Wireless Consumers, supra, 2000 WL 1140570 at ¶ 23. Were it otherwise, the companies would be effectively immune from suits for damages. If a "company is found monetarily liable for false advertising, it will presumably alter its advertising", but the "impact on its prices and other behavior ... is uncertain." Ibid. The FCC has explained further:
25. We also specifically disagree with those commenters who claim that any determination of monetary liability is equivalent to a finding that the service was inadequate for the price charged and therefore necessarily constitutes a finding that the rates originally charged were unreasonable. If a plaintiff asks a state court to make an outright determination of whether a price charged for a CMRS service was unreasonable, the court would be preempted from doing so *376 by Section 332. Likewise, if a state court were to set a prospective price for CMRS service, this action would also be preempted by Section 332.
26. On the other hand, a case may present a question of whether a CMRS service had indeed been provided in accordance with the terms and conditions of a contract or in accordance with the promises included in the CMRS carrier's advertising. Such a case could present breach of contract or false advertising claims appropriately reviewable by a state court. In such a situation, a court need not rule on the reasonableness of the CMRS carrier's charges in order to calculate compensation for the injury that was caused, even though it could be appropriate for it to take the price charged into consideration in calculating damages. In our view, the court would not be making a finding on the reasonableness of the price charged but would be examining whether under state law, there was a difference between promise and performance.
27. In short, we reject arguments by CMRS carriers that non-disclosure and consumer fraud claims are in fact disguised attacks on the reasonableness of the rate charged for the service. A carrier may charge whatever price it wishes and provide the level of service it wishes, as long as it does not misrepresent either the price or the quality of service. Conversely, a carrier that is charging a "reasonable rate" for its services may still be subject to damages for a non-disclosure or false advertising claim under applicable state law if it misrepresents what those rates are or how they will apply, or if it fails to inform consumers of other material terms, conditions, or limitations on the service it is providing. We thus do not agree with those commenters who allege that, for consumer protection claims, any damage award or damage calculation, including any refund or rebate, is necessarily a ruling on the reasonableness of the price or the functional equivalent of a retroactive rate adjustment.

[Id. at (footnote omitted).]
Further, we view Bastien to have been incorrectly decided on the false advertising and misrepresentation issues. That court assumed without basis that state court relief in those respects "would necessarily force AT & T Wireless to do more than required by the FCC: to provide more towers, clearer signals or lower rates," 205 F. 3d at 989, when the result might have been to require nothing more than accurate disclosure of the limitations of the service, as well as its advantages.
Moreover, rather than considering the FCC's opinion in Southwestern Bell and the Washington Supreme Court's opinion in Tenore, the Bastien court relied on a series of cases decided under the filed-rate or filed-tariff doctrine, which prohibits a company that must file rates with a regulatory body like the FCC from charging either more or less than the tariff filed with the agency. See AT&T Co. v. Central Office Tel., Inc., 524 U.S. 214, 229, 118 S.Ct. 1956, 1966, 141 L. Ed.2d 222, 237 (1998) (Rehnquist, C.J., concurring). The doctrine has its roots in statutes enacted long ago to prevent unreasonable and discriminatory charges in interstate commerce. Id. at 222, 118 S.Ct. at 1962, 141 L.Ed.2d at 233.
In Central Office, a jury had entered a multi-million dollar verdict based on AT&T's failure to provide the service promised in its literature and by one of its sales representatives. The court of appeals upheld the judgment on the theory that the state law cause of action arose out of the failure to provide the promised services and billing procedures, not deviation *377 from the rates contained in the filed tariff. Id. at 223, 118 S.Ct. at 1963, 141 L.Ed. 2d at 233. In holding otherwise, the Supreme Court reasoned that the setting of rates and provision of services were but two sides of the same coin:
Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa.

[Ibid.]
The filed-rate doctrine bars a damages award when plaintiff seeks to recover something other than the filed rate. Marcus v. AT&T Corp., 138 F. 3d 46, 60-62 (2d Cir.1998); Cahnmann v. Sprint Corp., 133 F.3d 484, 487 (7th Cir.), cert. denied, 524 U.S. 952, 118 S.Ct. 2368, 141 L.Ed.2d 737 (1998).
Historically, however, the filed-rate doctrine applies only to providers of land-line services; CMRS providers do not file their rates with the FCC. See Tenore, supra, 962 P.2d at 109-111; Wireless Consumers, supra, 2000 WL 1140570 at ¶ 19. Indeed, the FCC prohibits CMRS carriers from filing rates. Ibid. In concluding that the rationale of the filed-rate doctrine did not apply to CMRS cases, the FCC explained that section 332(c)(3) expressly distinguishes rates from other terms and conditions, which are subject to state jurisdiction, whereas the filed-rate doctrine flatly precludes the remedy of a damages award. Ibid. The agency reasoned:
20. In addition, the argument of CMRS providers ignores the fact that the filed rate cases arose under a totally different regulatory regime, one in which carriers file tariffs with a regulatory agency that are subject to scrutiny by the agency and the public, and under which carriers are bound to charge only the filed rate for the services they provide. The FCC has a different regime, in which the CMRS-customer relationship is not governed by terms set out by carriers in regulatory tariff filings, but by the mechanisms of a competitive marketplace. There is a distinction between rates that are filed with an agency and are subject to public and regulatory review, and prices that are determined and published by the carrier in a competitive marketplace.
21. The purposes behind the filed rate doctrine do not have the same relevance in CMRS cases. The statutory scheme of Section 203 directs the agency to assure reasonable rates, rate uniformity, and the absence of price discrimination by carriers through tariff filings and the filed rate doctrine. A mandatory detariffing regime, when applied to both CMRS and other nondominant carriers, constitutes a totally different framework for fulfilling our statutory responsibilities. We do not set CMRS rates or require that carriers only charge rates as filed. Rather than file tariffs to establish the legally effective rates (and other terms and conditions) for their offering, CMRS carriers enter into service contracts with their customers. We rely on the competitive marketplace to ensure that CMRS carriers do not charge rates that are unjust or unreasonable, or engage in unjust or unreasonable discrimination. We have found that this approach produces better results for CMRS consumers than assuring reasonable rates through tariffing and the application of the filed rate doctrine. Since the economic and regulatory regime is different and the purposes behind the filed rate doctrine do not apply to the unregulated CMRS market, we conclude that the analysis and logic found in the filed rate cases regarding the issue of whether the award *378 of monetary damages are equivalent to rate regulation is not applicable.

[Id. (footnotes omitted).]
The California Court of Appeal also distinguished cases relying on the filed-rate doctrine, on the basis that the ends that it serves, "to preserve the FCC's role in the ratemaking process and to ensure rate uniformity, would serve no purpose in an industry with no uniform, filed rates approved by the FCC." Spielholz, supra, 104 Cal.Rptr.2d at 206.
The court in Ball, supra, 96 Cal.Rptr. 2d at 807-08, read Bastien as prohibiting states from awarding damages based on the rates charged by a CMRS carrier, and cited Bastien with approval for the proposition that such claims are pre-empted. However, the Ball court rejected another element of Bastien's holding in determining that plaintiffs had stated a cause of action based on nondisclosure. Id. at 810-11. Likewise, in Naevus, supra, 713 N.Y.S.2d at 645, the court cited Bastien with approval only as supporting the court's dismissal of plaintiffs' breach of contract claim. Finally, in Spielholz, supra, 104 Cal.Rptr.2d at 207-08, the court expressly disagreed with Bastien to the extent that it barred misrepresentation and false advertising claims based on the filed-rate doctrine.
On the basis of the analyses employed by the FCC and several other courts, especially those in Ball, Naevus, and Spielholz, and for substantially the same reasons expressed in those cases, we conclude that plaintiffs' State law claims for relief based on the Consumer Fraud Act, common law fraud, and negligent representation are not barred by federal law.
The trial court herein did not address the alternative ground for dismissal urged by defendants and reiterated by them on appeal that the complaint fails to state a claim upon which relief could be granted, see R. 4:6-2(e); and normally we would not address the issue for that reason. The questions presented are, however, sufficiently straightforward and well fleshed-out in the parties' presentations as to suggest, for the sake of litigation efficiency, that we should decide this purely legal question.
In contending that the complaint should be dismissed because it fails to state a claim upon which relief can be granted, defendants argued before the trial court and reiterate on appeal that (1) their advertisements make no false statements, (2) plaintiffs cannot prove reasonable reliance on those advertisements, and (3) defendants cannot be liable for nondisclosure as distinguished from affirmative misrepresentations.
A motion to dismiss for failure to state a claim under R. 4:6-2(e) should be granted with great caution. Printing Mart, supra, 116 N.J. at 771-72, 563 A.2d 31; Leon v. Rite Aid Corp., 340 N.J.Super. 462, 466, 774 A.2d 674 (App.Div.2001). The test is whether a cause of action is suggested by the facts alleged in the complaint. Printing Mart, supra, 116 N.J. at 746, 563 A.2d 31. All of the facts alleged are deemed to be true, and plaintiffs are entitled to every reasonable inference to be derived from those facts. Ibid.; Rieder v. State, Dept. of Transp., 221 N.J.Super. 547, 552, 535 A.2d 512 (App.Div.1987). However, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by R. 4:46, and all parties shall be given reasonable opportunity to present all material pertinent to such a motion." R. 4:6-2.
Defendants, relying upon a certification by the marketing director of *379 AT&T Wireless Service, first contend that its advertisements did not contain any misrepresentations. In an action under the Consumer Fraud Act, the test is whether an advertisement has the capacity to mislead the average consumer. Cox v. Sears Roebuck & Co., 138 N.J. 2, 17, 647 A.2d 454 (1994); Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 69, 494 A.2d 804 (1985); Leon, supra, 340 N.J.Super. at 469-72, 774 A.2d 674; Chattin v. Cape May Greene, Inc. (I), 216 N.J.Super. 618, 639, 524 A.2d 841 (App.Div.), certif. denied, 107 N.J. 148, 526 A.2d 209 (1987); Miller, supra, 284 N.J.Super. at 74, 663 A.2d 643 (Ch.Div. 1995). Even if an advertisement is literally true, it may be actionable if "the overall impression [it] create[s] ... is misleading and deceptive to an ordinary reader." Id. at 87, 663 A.2d 643. Whether an advertisement is misleading presents a question of fact in most cases. Chattin (I), supra, 216 N.J.Super. at 639, 524 A.2d 841.
The complaint before us alleges that defendants' advertisements suggested their wireless services were so reliable that a wireless phone could be a consumer's only phone, and alleges further that the statements to that effect and others were not true. Defendants argue that their advertisements amount to mere puffing. They rely on Rodio v. Smith, 123 N.J. 345, 352, 587 A.2d 621 (1991), where the Court viewed the slogan "You're in good hands with Allstate" as not actionable because it did not misrepresent a material fact. In Leon, supra, 340 N.J.Super. at 472, 774 A.2d 674, we held that advertisements claiming defendant's prescription drugs were sold at the lowest and best prices had the capacity to mislead, and that the trial court erred in dismissing the complaint under R. 4:6-2(e). We declined to interpret Rodio as requiring a plaintiff to prove a misstatement of material fact to recover under the Act. Leon, supra, 340 N.J.Super. at 470, 774 A.2d 674. The statements challenged here are of the same ilk as those deemed actionable in Leon, and materially different from the slogan at issue in Rodio.
Incorrect statement and misstatement of fact are elements of both common law fraud and negligent misrepresentation. Kaufman v. i-Stat Corp., 165 N.J. 94, 109, 754 A.2d 1188 (2000). Indulgently read, the complaint alleges that defendants misstated fact when they claimed that their wireless service was as reliable as traditional land-line service. Whether the advertisements contained material misstatements of fact, or were merely puffing, as alleged by defendants, presents a question to be determined by the trier of fact.
Defendants claim that plaintiffs cannot be deemed to have reasonably relied on any of defendants' advertisements because the contract documents between them disclosed the possibility of interruptions and provided that customers had thirty days to cancel their agreements. There is no reliance requirement for Consumer Fraud Act liability, however. The Act establishes deceptive practices as actionable even if no person "has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2. Accord Gennari v. Weichert Co. Realtors, 148 N.J. 582, 607-08, 691 A.2d 350 (1997).
Of course, in order to recover damages, a victim of consumer fraud must prove an "ascertainable loss," N.J.S.A. 56:8-19, but that requirement has been broadly defined as embracing more than a monetary loss. An ascertainable loss occurs when a consumer receives less than what was promised. Miller, supra, 284 N.J.Super. at 89-91, 663 A.2d 643.
Common law fraud requires a showing of actual reliance, but not objectively reasonable reliance, since the perpetrator *380 of a fraud may not urge that the victim should have been "more circumspect or astute." Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 626 n. 1, 432 A.2d 521 (1981).
Negligent misrepresentation does require a showing of justifiable reliance, H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334, 461 A.2d 138 (1983), but nothing in the contractual terms between plaintiffs and defendants would warrant holding, as a matter of law, that plaintiffs' reliance was unreasonable. While the general terms and conditions in defendants' form contract state that disconnected calls may occur and that the consumer must still pay for such calls, the advertisements spelled out in the complaint suggest that disruptions would be unusual and infrequent.
It remains a question of fact whether other provisions of the contract documents are adequate to insulate defendants from recovery on any or all of plaintiffs' claimed causes of action.
We have concluded that plaintiffs' claims are not barred by principles of federal pre-emption and that the trial court's ruling to the contrary and its order dismissing the remaining claims in the complaint must be reversed. We have also concluded that defendants have not satisfied the standards of R. 4:6-2(e) for dismissal of those causes of action for failure to state a claim upon which relief can be granted, and that the motion to dismiss must be denied.
Accordingly, we reverse and remand.
NOTES
[*] "Rounding up" refers to the commonly employed practice of charging in one minute increments, even though the caller utilizes less than one minute. See Weinberg v. Sprint Corp., 165 F.R.D. 431, 435, appeal dismissed, 1996 WL 673501 (D.N.J.1996). Although Weinberg has been cited in a number of federal cases, we note that it addresses claims against providers of land line services, not CMRS providers. Hence, the court in Weinberg had no occasion to address the pre-emptive effect of 47 U.S.C.A. § 332(c)(3)(A), which applies exclusively to the cellular telephone industry.