**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0554-18T1

NICOLE PELLEGRINO MULLER
and CAROL PELLEGRINO,

      Plaintiffs-Respondents,

v.

FRED ALLEN BUILDERS, FRED
ZAPPOLO, STANLEY'S HOME
IMPROVEMENT, LLC, and
SHELDON FLEISCHMAN,

      Defendants,

and

JEFF SANDS,

      Defendant-Appellant.

_____

         Submitted March 30, 2020 – Decided May 5, 2020

         Before Judges Sumners and Geiger.

         On appeal from the Superior Court of New Jersey, Law
         Division, Gloucester County, Docket No. L-0289-16.

Law Offices of Jonathan J. Sobel, attorneys for appellant (Jonathan J. Sobel, of counsel and on the briefs).

Puff & Cockerill, LLC, attorneys for respondents (Ronald P. Sierzega, on the brief).

PER CURIAM

Defendant Jeff Sands appeals from a bench trial verdict and counsel fee award in favor of plaintiffs Nicole Pellegrino Muller and her mother, Carol Pellegrino. He also appeals from an order denying his motion for a new trial and reconsideration. For the following reasons, we reverse the judgment entered against Sands that awarded plaintiffs treble damages and attorneys' fees under the Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -20.

I.

This matter began when plaintiffs decided to add a bedroom to the rear of their home. They contacted Stanley's Home Improvement, LLC (Stanley's) regarding the project. After scheduling an appointment, plaintiffs met with Sands at their residence where he introduced himself as Stanley's vice president.

During the meeting, Sands observed the area where the work was to be performed, took notes, discussed financing, and explained that someone else would provide an estimate. Sands also gave plaintiffs a "sales pitch," stating

2

Stanley's had been in business for "many years," stood "by their work," and maintained "a terrific reputation."

After meeting with a different contractor, plaintiffs decided to hire Stanley's. Through email, Pellegrino Muller and Sands discussed financing, the type of work to be performed, and having defendant Fred Zappolo come to plaintiffs' residence to provide an estimate. In October 2014, plaintiffs met with Zappolo at their residence where he introduced himself as Stanley's foreman.

Soon after the meeting, Zappolo provided plaintiffs with an initial written estimate that culminated in a July 2015 agreement under the terms of which plaintiffs would pay $28,000 in return for construction of the addition, which was to be completed in nine weeks. The two-page agreement is printed on Fred Allen Builders[1] stationary. It is not signed by either plaintiff or Sands. In September 2015, plaintiffs made a $1400 payment and agreed in writing with Zappolo to add a door to the project for an additional $1000. Work then commenced on the addition.

As time passed, plaintiffs became increasingly concerned with the quality of work and whether the project would be completed within the agreed upon

---

[1] Fred Zappolo was the owner of Fred Allen Builders.

A-0554-18T1

nine-week time frame. On December 29, 2015, Pellegrino Muller expressed her concerns to Sands via email, stating: "[Sands] I'm over 12 weeks and $20,000 into this project and I have a mess off the back of my house. [Zappolo] doesn't seem to have answers on where we are and when things will be completed." Sands did not respond. Two days later, Pellegrino Muller emailed Sands a second time, asking if there was "someone [she] can speak to at Stanley's about this project." Once again, Sands did not respond.

On January 5, 2016, Pellegrino Muller emailed Sands a third time, noting that Sands was listed as vice president of Stanley's with the Better Business Bureau and requesting contact information for Stanley's owner. That same day, Sands responded: "I have been out of the business for over a year and Stanley['s] is no longer in business. You are dealing directly with [Zappolo] on this. I will try to help." Sands had no further contact with plaintiffs.

Two days later, Pellegrino Muller and Zappolo discussed, through email, payments made to date, the work to be completed, and reasons for the delay. At that point, only the footings, foundation, and two exterior walls had been constructed. Zappolo never returned to plaintiffs' residence to complete the project.

A-0554-18T1

On March 7, 2016, plaintiffs filed a four-count complaint against defendants Fred Allen Builders, Zappolo, Stanley's, Sheldon Fleischman (Stanley's owner), and Sands, asserting claims for: (1) breach of contract (count one); (2) violation of the covenant of good faith and fair dealing count (count two); (3) violation of the CFA (count three); and (4) fraud (count four). Sands filed a pro se answer. The other named defendants defaulted.

In December 2017, Sands moved for summary judgment. Plaintiffs opposed the motion. The trial court denied the motion.

On March 19, 2018, the court conducted a one-day bench trial on plaintiffs' CFA claim against Sands.[2] Plaintiffs, their expert witness Philip Aliano, and Sands—who appeared pro se—testified.

Plaintiffs' testimony recounted the facts set forth above. Pellegrino Muller testified that plaintiffs paid a total of $21,000 on the July 2015 agreement. When asked whether she was concerned that the agreement was printed on Fred Allen Builders stationary, Pellegrino Muller responded, "No, I had no reason to think that I wasn't dealing with Stanley's."

Plaintiffs further testified the work remained incomplete and that it was deteriorating. Pellegrino Muller noted plaintiffs contacted Aliano Brothers

---

[2] Plaintiffs abandoned their other causes of action against Sands.

Contractors for an estimate "to finish and repair" the addition. Aliano provided plaintiffs with a proposal for $39,600 in October 2016.

During cross-examination, plaintiffs acknowledged that Sands was not present when they entered into the July 2015 agreement nor anytime thereafter when the work was performed. Plaintiffs also acknowledged they never met with Sands regarding the design of the work; they did not hire Sands to perform the work; the agreement does not include Sand's name; and they did not pay any money directly to Sands. They further acknowledged that Sands was not involved in obtaining any of the permits for the project.

Plaintiffs then called Aliano, a general contractor and co-owner of Aliano Brothers Contractors, as a witness. The court qualified Aliano "as an expert in the field of general construction, house renovations and additions." Aliano testified he was contacted by plaintiffs for an estimate to complete the work they originally contracted Stanley's for. After having visited plaintiffs' residence, Aliano concluded that "[a] lot of the work had to be redone." According to Aliano, his October 2016 proposal for $39,600 reflected the cost to repair and complete the addition plaintiffs originally sought to construct.

Sands testified he has been in the catering business for approximately thirty-five years. He stated that during the summer of 2014, he "was out of work

A-0554-18T1

for a short period of time" and, as a favor, drove Fleischman around to run errands. Sands further stated that when he met with plaintiffs in September 2014, Fleischman "could not get out of the car" because he was "unwell," "so reluctantly [Sands ] went into [plaintiffs'] house" on Fleichman's behalf. Sands explained he gave his "email information to [p]laintiffs because [Fleichman] has no computer and it was an easier way for [plaintiffs] to contact [Fleichman] . . . that's all [he] did as far as passing on the information from there." Sands indicated he secured a job in the catering field that same month, where he has worked ever since. Sands testified he "was not on [Fleischman or Zappolo's] payroll"; "held no officer positions"; "wasn't an agent or representative" for Stanley's or Fred Allen Builders; was not paid any money by any of the other defendants; and did not receive any W-2 or 1099 forms from either company.

On June 15, 2018, the court held a proof hearing as to the defendants in default. Pellegrino Muller again recounted the same facts. Plaintiffs noted they sought treble damages and an award of attorneys' fees.

On June 21, 2018, the court issued an oral decision, finding Sands violated the CFA. The court found Pellegrino Muller "to be extremely credible," finding her testimony to be candid, reasonable, consistent, accurately recollected, and

7

non-evasive. The court recognized, however, that Pellegrino Muller "had an interest in the outcome of the case."

In contrast, the court "did not find [Sands] to be credible." The court explained that his testimony was "inconsistent" and "did not make sense." It noted, "[h]e said he received no money, but he's taking [Fleischman] around on business appointments and then he's actually going in and conducting the business appointment itself and he was listed as vice president." The court did not find Sands' testimony that "he wasn't a friend of Mr. Fleischman and only an acquaintance, he was not working, and he was not paid at all," to be credible. As to his claim that someone else listed his name as vice president with the Better Business Bureau, the court noted Sands persuaded he sold "this job" to plaintiffs during "his initial meeting with them."

The court determined that Sands violated the CFA, finding that he was "absolutely and totally involved" because he conducted himself as an agent of Stanley's and Fred Allen Builders; was the contact person as evidenced by the emails; went to plaintiffs' house; discussed the financing; indicated Zappolo would be the foreman and provided his contact information. Although Sands "did not sign the contract itself," the court found Sands "engaged in

unconscionable commercial practices" through "misrepresentations," taking "affirmative steps," and acting "by way of omission."

After finding the defaulted defendants also violated the CFA, the court held all defendants are jointly and severally liable and awarded treble damages of $181,800. That amount was calculated by trebling the sum of $60,600, comprised of the $21,000 plaintiffs paid to Zappolo defendants and the $39,600 estimate to repair and complete the addition.

The court also awarded plaintiffs attorneys' fees in the amount of $19,264.47, apportioning $13,864.23 against Sands and the remaining $5,400.24 against the defaulted defendants. The court did not make findings regarding the reasonableness of the hours billed, the hourly rate charged, or other relevant factors, and simply noted it was "satisfied from the Affidavit of Services that those figures are correct as stated in the order for judgment."

A judgment reflecting those rulings was entered on June 21, 2018. Sands, now represented by counsel, moved for a new trial, reconsideration, or remittitur. The court issued an order and written decision denying the motion. The court concluded that plaintiffs demonstrated Sands violated the CFA by "clear and convincing evidence" and plaintiffs "suffered an ascertainable loss." The court reiterated its credibility findings and described Sands' description of

his relationship with the other defendants as "not plausible." The court found there was no miscarriage of justice because sufficient credible evidence supported its decision. The court also denied Sands' alternative request for remittitur, stating "[t]he decision in this matter does not shock the conscience of the court, but is based on the evidence presented." This appeal followed.

On appeal, Sands argues the trial court erred by: (1) finding Sands violated the CFA; (2) imposing individual liability against Sands; and (3) imposing attorneys' fees against Sands. We agree.

## II.

Our scope of review following a bench trial is limited. An appellate court will "not disturb the factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]" Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011) (second alteration in original) (quoting In re Trust Created By Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008)). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp.

Comm. of Manalapan, 140 N.J. 366, 378 (1995) (citations omitted). We review those legal assessments de novo. Ibid.

The CFA affords "relief to consumers from 'fraudulent practices in the market place.'" Lee v. Carter-Reed Co., 203 N.J. 496, 521 (2010) (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 11 (2004)). The CFA provides relief to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act." N.J.S.A. 56:8-19. "Thus, to state a claim under the CFA, a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." N.J. Citizen Action v. Schering-Plough Corp., 367 N.J. Super. 8, 12-13 (App. Div. 2003). Prevailing plaintiffs are entitled to treble damages for losses resulting from the violations, as well as the "award [of] reasonable attorneys' fees, filing fees and reasonable costs of suit." N.J.S.A. 56:8-19.

"An 'unlawful practice' contravening the CFA may arise from (1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation." Dugan v. TGI Fridays, Inc., 231 N.J. 24, 51 (2017) (citing

11

Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234, 245 (2005); Cox v. Sears Roebuck & Co., 138 N.J. 2, 17 (1994)). "The language of the CFA specifically identifies a variety of affirmative acts, including 'deception, fraud, false pretense, false promise, [and] misrepresentation,' and it also identifies as actionable 'the knowing[] concealment, suppression or omission of any material fact,' if intentional, N.J.S.A. 56:8-2." Allen v. V and A Bros., Inc., 208 N.J. 114, 131 (2011) (alterations in original).

"[A]n affirmative misrepresentation is 'one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase.'" Mango v. Pierce-Coombs, 370 N.J. Super. 239, 251 (App. Div. 2004) (quoting Ji v. Palmer, 333 N.J. Super. 451, 462 (App. Div. 2000)). A statement is material if:

> (a) a reasonable person would attach importance to its existence in determining a choice of action . . . ; or (b) the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it.
>
> [Palmer, 333 N.J. Super. at 462 (alteration in original) (quoting Restatement (Second) of Torts § 538(2) (Am. Law Inst. 1977)).]

"A showing of intent is not essential if the claimed CFA violation is an affirmative act or a regulatory violation, but such a showing is necessary if the

claimed violation is an omission pursuant to N.J.S.A. 56:8-2." Dugan, 231 N.J. at 51 (citations omitted).

### III.

The evidence adduced at trial does not support the trial court's determination that Sands violated the CFA by personally engaging in an unconscionable business practice. After scheduling an appointment with Stanley's, plaintiffs met with Sands at their residence in September 2014. Plaintiffs testified that Sands introduced himself as Stanley's vice president and that, during the meeting, Sands observed the area where the work was to be performed; "took notes"; discussed financing; explained another person would have to come out to provide an estimate; and delivered a "sales pitch." Then, through email, Pellegrino Muller and Sands discussed financing, the type of work to be performed, and having Zappolo come out to provide an estimate.

The evidence shows that plaintiffs and Sands had no further contact until December 29, 2015, when Pellegrino Muller emailed Sands, expressing concern about the slow, substandard work and sought contact information for Stanley's owner. Sands informed Pellegrino Muller that he had "been out of the business for over a year," "Stanley['s] is no longer in business," and she would be "dealing

directly with [Zappolo] on this." Although Sands stated he would "try to help," he had no contact with plaintiffs thereafter.

The trial court found that Sands conducted himself as an agent of Stanley's and Fred Allen Builders and was listed as Stanley's vice president with the Better Business Bureau. Being an agent or officer, however, without more, does not establish an unlawful business practice under the CFA. Instead, to be liable, plaintiffs were required to prove that Sands engaged in an affirmative act; a knowing omission; or violated an administrative regulation. Dugan, 231 N.J. at 51. Plaintiffs did not satisfy this requirement.

On these facts, plaintiffs did not prove that Sands engaged in an unlawful practice as contemplated by the CFA. The record is devoid of any evidence that Sands was present when any of the work was performed, involved in the design of the work, or involved in obtaining any permits for the project. Nor is there any evidence that Sands participated in a decision by the other defendants to deviate from the plans or the Construction Code, to stop performing the work, or to abandon the project. Further, Sands was not present when plaintiffs entered into the agreement, his name does not appear on the agreement, he did not sign the agreement, nor did he receive any payments. Indeed, the record shows

14

plaintiffs and Sands had no contact for over a year until plaintiffs became concerned with Zappolo's work.

The court stated, "Sands sold the project to [plaintiffs] through their conversation and through his fraudulent representations, he also expressly implied that he had the ability to get this job done." In order "[t]o constitute consumer fraud . . . the business practice in question must be 'misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer." Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 139 N.J. 392, 416 (1995). The Court has recognized the "distinction between misrepresentations of fact actionable under the CFA and mere puffing about a product or a company that will not support relief." Schering-Plough Corp., 367 N.J. Super. at 13 (citing Rodio v. Smith, 123 N.J. 345, 352 (1991)). Applying this standard, we conclude Sands' sales pitch to plaintiffs that Stanley's had been in business for many years, stood by their work, and possessed a terrific reputation, "are not actionable statements of fact within the meaning and intendment of the CFA." Ibid. Instead, they amount to mere puffery and do not provide a basis for liability under the CFA. Id. at 14.

Moreover, Stanley's is a limited liability company. Absent certain limited circumstances, an employee, member, or officer of a limited liability company

is not personally responsible for the debts, obligations, liabilities, negligence, or intentional torts of a limited liability company. See N.J.S.A. 42:2C-30. Other than engaging in mere puffery, plaintiffs have not shown that Sands personally made actionable fraudulent statements or engaged in other unlawful acts that would render him personally liable under the CFA.

As to Fred Allen Builders, the record does not indicate whether it was a sole proprietorship, partnership, limited liability company, or corporation. Nevertheless, there is no evidence that Sands was an owner, general or limited partner, shareholder, or officer of that entity.

We recognize that in Allen, the Court held the CFA permits the imposition of individual liability upon one whose own affirmative acts or knowing omissions are part of a violation by a corporation. 208 N.J. at 130-33 (citing N.J.S.A. 56:8-2). The Court made clear, however, that "individuals were not liable" under the CFA "merely because of the act of the corporate entity." Id. at 132. In order to impose individual liability, the employee or corporate officer must have personally "engaged in conduct prohibited by the CFA." Ibid. As we have stated, no such evidence was presented in this case.

We hold that plaintiffs did not meet their burden of proving that Sands violated the CFA. Accordingly, plaintiffs are not entitled to an award of

16

damages, much less treble damages from him. See Union Ink Co. v. AT&T Corp., 352 N.J. Super. 617, 646 (App. Div. 2002) (plaintiffs must prove they suffered an "ascertainable loss" as the result of an unlawful practice to recover treble damages under the CFA (quoting N.J.S.A. 56:8-19)). Nor are they entitled to an award of reasonable attorneys' fees and costs of suit against Sands under N.J.S.A. 56:8-19. See Furst, 182 N.J. at 21 (prevailing plaintiff is entitled to recover reasonable attorneys' fees, filing fees, and costs of suit under the CFA (quotations omitted)); Heyert v. Taddese, 431 N.J. Super. 388, 443 (App. Div. 2013) (same). In view of our ruling, we do not reach the remaining issues raised by Sands.

We reverse the judgment for treble damages and attorneys' fees entered against Sands. Our ruling does not affect the default judgment entered against the other defendants. The trial court shall enter an amended judgment consistent with this opinion.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION